UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| LUIS PACHECO, Derivatively on Behalf of OPHTHOTECH CORPORATION,<br><br>                              Plaintiff,<br><br>          v.<br><br>DAVID R. GUYER, GLENN P. SBLENDORIO, DAVID E. REDLICK, THOMAS DYRBERG, AXEL BOLTE, MICHAEL J. ROSS, SAMIR C. PATEL, and NICHOLAS GALAKATOS,<br><br>                              Defendants,<br><br>     -and-<br><br>OPHTHOTECH CORPORATION, a Delaware corporation,<br><br>               Nominal Defendant. | Case No.<br><br>VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FICUCIARY DUTY, WASTE OF CORPORATE ASSETS, AND UNJUST ENRICHMENT<br><br><br><br><br><br><br><br><br><br><br><br>DEMAND FOR JURY TRIAL |

Plaintiff, by his attorneys, submits this Verified Stockholder Derivative Complaint for Breach of Fiduciary Duty, Waste of Corporate Assets, and Unjust Enrichment. Plaintiff alleges the following on information and belief, except as to the allegations specifically pertaining to plaintiff which are based on personal knowledge. This complaint is also based on the investigation of plaintiff's counsel, which included, among other things, a review of public filings with the U.S. Securities and Exchange Commission ("SEC") and a review of news reports, press releases, and other publicly available sources.

## NATURE AND SUMMARY OF THE ACTION

1.      This is a stockholder derivative action brought by plaintiff on behalf of nominal defendant Ophthotech Corporation ("Ophthotech" or the "Company") against certain of its officers and directors for breaches of fiduciary duties and violations of law. These wrongs resulted in over a billion of dollars in damages to Ophthotech's reputation, goodwill, and

- 1 -

standing in the business community.  Moreover, these actions have exposed Ophthotech to over a billion dollars in potential liability for violations of state and federal law.

2.      Ophthotech is a biopharmaceutical company specializing in the development of therapies to treat diseases of the eye.  The Company focuses in particular on treating age-related macular degeneration ("AMD").  Throughout the relevant period, Ophthotech's lead drug candidate was Fovista, a therapy for treating a version of the AMD known as "wet" AMD.

3.      Ophthotech has never actually had a drug approved for sale in the U.S. (or anywhere) by the U.S. Food and Drug Administration ("FDA").  The approval process is long and costly and involves multiple clinical trials over several "Phases."  The purpose of these trials is to demonstrate to the FDA the safety and efficacy of a drug.  Since Ophthotech has no products for sale, it is reliant on raising money for the drug trials from investors and its development partners.[1]  Accordingly, investors and the public in general pay close attention to the results of the Company's clinical drug trials.

4.      In 2012, the defendants announced the results of Fovista's Phase 2b clinical trial.  The trial compared patients taking Fovista, in conjunction with the then current treatment for wet AMD, Lucentis, with patients taking Lucentis alone.  Defendants called the drug's results "extraordinary" and a "breakthrough."  With this news at the forefront of investors' minds, the Company went public and raised hundreds of millions of dollars.

5.      The next step in the approval process was for the Company to conduct a Phase 3 trial on Fovista for submission to the FDA.  While preparing for that trial, the defendants repeated many of the claims about Fovista's breakthrough drug trial results, including "the

_____

[1] Drug developmental companies often bring in established and larger drug companies to partner on the development of a drug in exchange for payments if the drug reaches certain milestones.

statistical and clinical significance" of the results.  The truth was, however, that the Company's Phase 2b trial was fundamentally flawed.  The control group that took only Lucentis had more severe cases of wet AMD with larger lesions and poorer vision.  As a result, these patients were less like to see any improvement compared to the Fovista group.  Therefore, the Phase 2b trial did not demonstrate Fovista's efficacy.

6.       In addition, the defendants repeatedly claimed that the Phase 2b and Phase 3 trials contained no meaningful distinctions when it came to the patient criteria.  This was also incorrect.  Whereas the Phase 2b trial excluded patients with a specific type of lesion, the "pure occult" lesion, the Phase 3 methodology did not result in such exclusion.

7.       Defendants' statements kept the Company's stock price inflated while investors and the public awaited the Phase 3 results that would confirm these "extraordinary results." Certain of the Individual Defendants (as defined herein) then took advantage of that inflation and their knowledge about Fovista's true prospects to sell over $162 million of their own personally held stock or stock held by entities they control.

8.       On December 12, 2016, the Company announced that the Phase 3 trials revealed that there was "[n]o benefit observed" by taking Fovista in addition to Lucentis, the exact opposite result than the Phase 2b trial's supposed results.  In other words, the Phase 3 trial was a complete failure and, as a result, the Company would not continue to develop Fovista.

9.       In the wake of this disclosure, Ophthotech's stock plunged more than 86%, or $33.48 per share, to close at $5.29 per share, erasing almost $1.2 billion in market capitalization. Today, the Company's stock trades at just over $2.30 per share, a more than 95% drop from its high of $78.64 per share, a loss of over $2.5 billion.

10.     Further, as a direct result of this unlawful course of conduct, Ophthotech is now the subject a federal securities class action lawsuit filed in the U.S. District Court for the Southern District of New York on behalf of investors who purchased Ophthotech's shares.

## JURISDICTION AND VENUE

11.     Jurisdiction is conferred by 28 U.S.C. §1332.   Complete diversity among the parties exists and the amount in controversy exceeds $75,000, exclusive of interests and costs.

12.     This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by the District courts permissible under traditional notions of fair play and substantial justice.

13.     Venue is proper in this Court in accordance with 28 U.S.C. §1391(a) because: (i) Ophthotech maintains its principal place of business in this District; (ii) one or more of the defendants either resides in or maintains executive offices in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein, and aiding and abetting and conspiracy in violation of fiduciary duties owed to Ophthotech, occurred in this District; and (iv) defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## THE PARTIES

**Plaintiff**

14.     Plaintiff Luis Pacheco was a stockholder of Ophthotech at the time of the wrongdoing complained of, has continuously been a stockholder since that time, and is a current Ophthotech stockholder.  Plaintiff is a citizen of Florida.

**Nominal Defendant**

15.     Nominal defendant Ophthotech is a Delaware corporation with principal executive offices located at One Penn Plaza, 35th Floor, New York, New York.  Accordingly, Ophthotech is a citizen of Delaware and New York.  Ophthotech is a biopharmaceutical company that specializes in the development of therapies to treat ophthalmic diseases, with a focus on age-related and orphan retinal diseases.  As of January 31, 2018, Ophthotech had thirty-eight employees.

**Defendants**

16.     Defendant David R. Guyer ("Guyer") is Ophthotech's Executive Chairman and has been since July 2017.  Defendant Guyer was also Ophthotech's Chairman of the Board of Directors (the "Board") from January 2007 to July 2017; Chief Executive Officer ("CEO") from April 2013 to June 2017; and cofounded the Company in 2007.  Defendant Guyer is named as a defendant in a related consolidated securities class action complaint that alleges he violated sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act").  Defendant Guyer knowingly, recklessly, or with gross negligence made improper statements in Ophthotech's press releases and public filings.  While in possession of material, nonpublic information concerning Ophthotech's true business health, defendant Guyer sold 438,809 shares of his stock for $22,606,621.97 in proceeds.  Ophthotech paid defendant Guyer the following

compensation as an executive:

| Year | Salary | Bonus | Stock Awards | Option Awards | Non-Equity Incentive Plan Compensation | All Other Compensation | Total |
|------|--------|-------|--------------|---------------|----------------------------------------|------------------------|-------|
| 2017 | $625,200 | $304,785 | $287,731 | $1,441,714 | $406,380 | $8,000 | $3,073,810 |
| 2016 | $625,200 | - | $3,291,750 | $4,448,530 | $325,104 | $10,405 | $8,700,989 |
| 2015 | $600,000 | - | $1,048,800 | $2,713,323 | $486,000 | $18,758 | $4,866,881 |

Defendant Guyer is a citizen of New York.

17.     Defendant Glenn P. Sblendorio ("Sblendorio") is Ophthotech's CEO and has been since July 2017 and President and has been since January 2017 and a director and has been since May 2017.  Defendant Sblendorio was also Ophthotech's Executive Vice President and Chief Operating Officer from April 2016 to January 2017; Chief Financial Officer ("CFO") and Treasurer from April 2016 to April 2017; and director from July 2013 to March 2016. Defendant Sblendorio was also Chairman of Ophthotech's Audit Committee from at least April 2014 to January 2016 and a member of that committee from July 2013 to January 2016. Defendant Sblendorio knowingly, recklessly, or with gross negligence made improper statements in Ophthotech's press releases and public filings.  While in possession of material, nonpublic information concerning Ophthotech's true business health, defendant Sblendorio sold 5,671 shares of his stock for $400,381.20 in proceeds.  Ophthotech paid defendant Sblendorio the following compensation as an executive:

| Year | Salary | Bonus | Stock Awards | Option Awards | Non-Equity Incentive Plan Compensation | All Other Compensation | Total |
|------|--------|-------|--------------|---------------|----------------------------------------|------------------------|-------|
| 2017 | $560,000 | $204,188 | $192,765 | $1,648,325 | $406,250 | $100,100 | $3,111,628 |
| 2016 | $373,154 | $100,000 | $3,887,705 | $4,256,339 | $163,350 | $98,356 | $8,878,904 |

And as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Option Awards | Total |
|-------------|-------------------|--------------|---------------|-------|
| 2016 | $11,250 | - | - | $11,250 |
| 2015 | $61,500 | $84,525 | $195,298 | $341,323 |

Defendant Sblendorio is a citizen of New Jersey.

18.     Defendant David E. Redlick ("Redlick") is Ophthotech's Independent Lead Director and has been since February 2017 and a director and has been since January 2016. Defendant Redlick is also a member of Ophthotech's Audit Committee and has been from January 2016 to at least April 2018.  Defendant Redlick knowingly or recklessly made improper statements in Ophthotech's public filings.   Ophthotech paid defendant Redlick the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Option Awards | Total |
|---|---|---|---|---|
| 2017 | $95,000 | - | $26,584 | $121,584 |
| 2016 | $64,375 | $102,008 | $1,163,940 | $1,330,323 |

Defendant Redlick is a citizen of Massachusetts.

19.     Defendant Thomas Dyrberg ("Dyrberg") is an Ophthotech director and has been since August 2007.  Defendant Dyrberg is also Chairman of Ophthotech's Nominating and Corporate Governance Committee and a member of that committee and has been since at least April 2014 to at least April 2018.  Defendant Dyrberg knowingly or recklessly made improper statements in Ophthotech's public filings.   While defendant Dyrberg was in possession of material, nonpublic information concerning Ophthotech's true business health, Novo A/S, of which he was the CEO, sold 2,305,000 shares of its stock for $115,708,750 in proceeds.  Upon information and belief, defendant Dyrberg is a citizen of Denmark.

20.     Defendant Axel Bolte ("Bolte") is an Ophthotech director and has been since August 2007.  Defendant Bolte is also a member of Ophthotech's Audit Committee and has been since at least April 2014 to at least April 2018 and a member of  Ophthotech's  Nominating and Corporate Governance Committee and has been since at least April 2014 to at least April 2018. Defendant Bolte was also Chairman of Ophthotech's Audit Committee from at least April 2016

to at least August 2016.  Defendant Bolte knowingly or recklessly made improper statements in Ophthotech's public filings.  Ophthotech paid defendant Bolte the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Option Awards | Total |
|---|---|---|---|
| 2017 | $66,250 | $26,584 | $92,834 |

Upon information and belief, defendant Bolte is a citizen of Switzerland.

21.    Defendant Michael J. Ross ("Ross") is an Ophthotech director and has been since May 2013.  Defendant Ross is also a member of Ophthotech's Nominating and Corporate Governance Committee and has been since at least April 2014 to at least April 2018.  Defendant Ross knowingly or recklessly made improper statements in Ophthotech's public filings. Ophthotech paid defendant Ross the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Option Awards | Total |
|---|---|---|---|---|
| 2017 | $63,750 | - | $26,584 | $90,334 |
| 2016 | $61,250 | $102,008 | $244,950 | $408,208 |
| 2015 | $53,750 | $84,525 | $195,298 | $333,573 |

Defendant Ross is citizen of California.

22.    Defendant Samir C. Patel ("Patel") is a consultant to the Company and has been since January 2017.  Defendant Patel was also Ophthotech's President, Vice Chairman, and a director from January 2007 to January 2017; CEO from January 2007 to April 2013; and cofounded the Company in 2007.  Defendant Patel is named as a defendant in a related consolidated securities class action complaint that alleges he violated sections 10(b) and 20(a) of the Exchange Act.  Defendant Patel knowingly, recklessly, or with gross negligence made improper statements in Ophthotech's press releases and public filings.  While in possession of material, nonpublic information concerning Ophthotech's true business health, defendant Patel sold 424,397 shares of his stock for $22,872,916.21 in proceeds.  Ophthotech paid defendant

Patel the following compensation as an executive:

| Year | Salary | Stock Awards | Option Awards | Non-Equity Incentive Plan Compensation | All Other Compensation | Total |
|------|--------|--------------|---------------|----------------------------------------|------------------------|-------|
| 2016 | $591,231 | $3,291,750 | $4,448,530 | $325,104 | $31,455 | $8,688,070 |
| 2015 | $486,450 | $4,511,600 | $2,312,997 | $361,190 | $9,038 | $7,681,275 |

Defendant Patel is a citizen of New Jersey.

23.    Defendant Nicholas Galakatos ("Galakatos") was an Ophthotech director from December 2009 to May 2016.  Defendant Galakatos was also a member of Ophthotech's Audit Committee from at least April 2014 to at least April 2016.  Defendant Galakatos knowingly or recklessly made improper statements in Ophthotech's public filings.  While in possession of material, nonpublic information concerning Ophthotech's true business health, defendant Galakatos sold 12,000 shares of his stock for $740,514.67 in proceeds.  Ophthotech paid defendant Galakatos the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Option Awards | Total |
|-------------|-------------------|--------------|---------------|-------|
| 2016 | $35,000 | - | - | $35,000 |
| 2015 | $65,000 | $84,525 | $195,298 | $344,823 |

Defendant Galakatos is a citizen of Massachusetts.

24.    The defendants identified in ¶¶16-17, 22 are referred to herein as the "Officer Defendants."   The defendants identified in ¶¶16-23 are referred to herein as the "Director Defendants."  The defendants identified in ¶¶17-18, 20, 23 are referred to herein as the "Audit Committee Defendants."  The defendants identified in ¶¶16-17, 19, 22-23 are referred to herein as the "Insider Selling Defendants."  Collectively, the defendants identified in ¶¶16-23 are referred to herein as the "Individual Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

**Fiduciary Duties**

25.     By reason of their positions as officers and directors of Ophthotech, each of the Individual Defendants owed and owe Ophthotech and its stockholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Ophthotech in a fair, just, honest, and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of Ophthotech and not in furtherance of their personal interest or benefit.

26.     To discharge their duties, the officers and directors of Ophthotech were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of Ophthotech.   By virtue of such duties, the officers and directors of Ophthotech were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable laws, rules, and regulations;

(b)     ensure that the Company complied with its legal obligations and requirements—including requirements involving the filing of accurate financial and operational information with the SEC and the public;

(c)     refrain from trading in the Company's stock on the basis of their knowledge of nonpublic information;

(d)     conduct the affairs of Ophthotech in an efficient, business-like manner in compliance with all applicable laws, rules, and regulations so as to make it possible to provide the highest quality performance of its business, to avoid wasting Ophthotech's assets, and to maximize the value of Ophthotech's stock; and

(e)     remain informed as to how Ophthotech conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with applicable laws.

**Additional Duties of the Audit Committee Defendants**

27.     In addition to these duties, under its Charter, the Audit Committee Defendants, defendants Bolte, Galakatos, Redlick, and Sblendorio, owed specific duties to Ophthotech to assist "the Board's oversight of the Company's accounting and financial reporting processes…." Moreover the Audit Committee's Charter provides that the members are responsible for reviewing and discussing with the Company's management and independent auditor "the Company's audited financial statements, including matters required to be discussed by [the Public Company Accounting Oversight Board] auditing standards and SEC rules." Further, the Audit Committee's Charter, explains the following concerning the Board's controls and procedures:

> …Oversight. The Audit Committee shall coordinate the Board's oversight of the Company's internal control over financial reporting, disclosure controls and procedures and code of conduct. The Audit Committee shall receive and review the reports of the Chief Executive Officer and the Chief Financial Officer required by Rule 13a-14 under the Exchange Act.
>
> …Risk Management. The Audit Committee shall discuss the Company's policies with respect to risk assessment and risk management, including guidelines and policies to govern the process by which the Company's exposure to risk is handled.

**Breaches of Duties**

28.     The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as officers and directors of Ophthotech, the absence of good faith on their part, and a reckless disregard for their duties to Ophthotech that

the Individual Defendants were aware or reckless in not being aware posed a risk of serious injury to Ophthotech.

29.     The Individual Defendants breached their duty of loyalty and good faith by allowing defendants to cause, or by themselves causing, Ophthotech to make improper statements about the Company's Phase 2b and Phase 3 clinical trials, engage in improper practices that wasted Ophthotech's assets, and caused Ophthotech to incur substantial damage.

30.     The Individual Defendants, because of their positions of control and authority as officers and/or directors of Ophthotech, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein.  The Individual Defendants also failed to prevent the other Individual Defendants from taking such illegal actions.  As a result, and in addition to the damage Ophthotech has already incurred, Ophthotech has expended, and will continue to expend, significant sums of money.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

31.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their common plan or design.  In addition to the wrongful conduct herein alleged as giving rise to primary liability, the Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

32.     During all times relevant hereto, the Individual Defendants, collectively and individually, initiated a course of conduct that was designed to and did: (i) deceive the investing public, including stockholders of Ophthotech, regarding the Individual Defendants' management of Ophthotech's operations and likelihood of success and FDA approval for Fovista, its key product; (ii) facilitate certain of the Individual Defendants' illicit sale of over $162 million of

their personally held shares while in possession of material, nonpublic information; and (iii) enhance the Individual Defendants' executive and directorial positions at Ophthotech and the profits, power, and prestige that the Individual Defendants enjoyed as a result of holding these positions.   In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants, collectively and individually, took the actions set forth herein.

33.     The Individual Defendants engaged in a conspiracy, common enterprise, and/or common course of conduct.  During this time, the Individual Defendants caused Ophthotech to issue improper financial statements.

34.     The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to disguise the Individual Defendants' violations of law, breaches of fiduciary duty, waste of corporate assets, and unjust enrichment; and to conceal adverse information concerning Ophthotech's operations, financial condition, and future business prospects.

35.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing Ophthotech to purposefully or recklessly release improper statements.  Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

36.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted in the accomplishment of that wrongdoing, and was aware of his overall contribution to and furtherance of the wrongdoing.

## OPHTHOTECH'S LONG AND COSTLY CLINICAL TRIAL OF
## FOVISTA IS A COMPLETE FAILURE

37.     Ophthotech is a science-driven biopharmaceutical company specializing in the development of novel therapies to treat ophthalmic diseases, with a focus on age-related and orphan retinal diseases.  Defendants Guyer and Patel cofounded Ophthotech in 2007.[2]

38.     During the relevant period, the only source of revenue for the Company was through a licensing and commercialization agreement with Novartis Pharma AG ("Novartis") (the "Novartis Agreement").  The Novartis Agreement gave Novartis the exclusive right to manufacture Fovista.  In exchange for this right, Novartis provided the Company with payments based on certain milestones it reached in the development of Fovista.  As explained herein, when the Phase 3 test of Fovista failed, Novartis canceled the agreement and the Company now has no sources of revenue.  However, prior to that time, the ability of the Company to make money was entirely dependent on Fovista and its eventual approval for sale by the FDA.

39.     The Company was developing Fovista to treat "wet" AMD.  Wet AMD is a disorder of the central portion of the retina.  Individuals with wet AMD experience blurred vision and blind spots as a result of abnormal blood vessels that leak fluid or blood into the retina.  Approximately 10% of all AMD cases are wet AMD.  It is, however, a particularly severe form of AMD that causes 90% of the severe vision loss from AMD.

40.     Fovista, and anti-platelet derived growth factors ("anti-PDGF"), was supposed to block proteins that bind to cells in the outer lining of the abnormal blood vessels.  It would work in conjunction with the current treatment for wet AMD, an anti-vascular endothelial growth

---

[2] Defendants Guyer and Patel previously cofounded Eyetech Pharmaceuticals, Inc. ("Eyetech").  OSI Pharmaceuticals, Inc. bought Eyetech for over $930 million in 2005.  Notably, defendant Sblendorio was the CFO of Eyetech.

factor ("anti-VEGF").  Anti-VEGF drugs block proteins that bind to cells on the inner lining of blood vessels.

41.     In order for a drug developer to sell its drug product in the United States, the developer must first receive approval from the FDA.  This is a long, arduous, and expensive process.  It requires lengthy, expensive, and time-consuming tests and trials.  The further a company proceeds through the testing process, the larger, longer, and more expensive the trials become.

42.     The first stage in the process is a Phase 1 trial in which a company tests a medication's safety, appropriate dosage, and side effects on a small group of patients.  This is followed by a Phase 2 trial that uses a larger group of patients to test a drug's effectiveness and side effects.  Phase 3, normally the final Phase in the approval process, uses the largest group of patients.  Phase 3 clinical trials compare the medication to other commonly used treatments and provide further information on the medication's safety and efficacy.  According to FDA guidelines and pharmaceutical standards, these trials usually take several years to complete to determine the long-term effects of a medication on patients.  Further, sometimes there is more than one study or trial done at each Phase.

43.     This action concerns the Company's Phase 2b and Phase 3 clinical trials of Fovista.  The Phase 2b trial was a twenty-four-week randomized, double-blind clinical trial of 449 patients with wet AMD.  Ophthotech completed its Phase 2b trial of Fovista in June 2012.  The Phase 2b trial studied Fovista's effects on wet AMD patients when used in combination with Lucentis, an anti-VEGF agent.  The results of the combination study were compared against the control group that just used Lucentis.  The Phase 2b trial tested the patients' visual acuity after undergoing treatment.  The Individual Defendants described the Phase 2b tests as an unmitigated

success, as the Fovista combination group substantially (and statistically) out-performed the Lucentis control group.

44.     As was subsequently revealed, however, the Lucentis control group patients had larger lesions (areas of altered tissue and abnormal blood vessels) and poorer vision.  Because of this, the control group patients' afflictions were chronic and more difficult to treat, which resulted in less of a benefit to them from the treatment than the Fovista combination group.

45.     After announcing the supposedly successful results of the Phase 2b trials, the Company initiated Phase 3 trials.  The Individual Defendants wanted to assure the public that the same breakthrough results present in the Phase 2b trial would occur in the Phase 3 trial and therefore continually claimed that there were no meaningful or significant changes, increasing the likelihood of replication of the Phase 2b results.  This was incorrect.  Ophthotech's Phase 2b test enrolled wet AMD suffers with "classic" lesions and excluded patients with a lesion subtype known as "pure occult."  The Company enrolled patients in the Phase 3 trial based on the presence of subretinal hyper-reflective material ("SHRM").  SHRM was a relatively newly discovered abnormal tissue that can appear in wet AMD patients with or without pure occult lesions.  At the time of the Phase 3 trial, SHRM was not fully understood.  Despite this fact, the Individual Defendants claimed that SHRM was the same as the classic lesion, and therefore the same patients were eligible for the Phase 3 trial as the Phase 2b trial.  The Individual Defendants claimed that they only "modified the methodology" used to determine eligibility, not eligibility itself.  However, by basing admittance into the Phase 3 trial on the presence of SHRM, the Individual Defendants allowed an entirely new type of lesion into the trial.

46.     The Phase 3 trial was a massive undertaking.  The Company enrolled more than 1,860 patients in over 250 centers internationally.  Ophthotech raised a substantial amount of

money based, at least in part, on the Phase 2b trials results.  In particular, the Company completed its initial public offering on September 30, 2013, raising approximately $175 million. Ophthotech held a second offering on February 18, 2014, whereby it raised another $55.4 million.

47.     On August 29, 2013, the Company launched the "pivotal" Phase 3 trial.  It was a total and complete failure.  On December 12, 2016, the Company announced that there was no observed benefit to taking Fovista with Lucentis instead of just taking Lucentis alone to treat wet AMD.

## THE INDIVIDUAL DEFENDANTS ARE RESPONSIBLE FOR A SERIES OF IMPROPER STATEMENTS

48.     The Individual Defendants are responsible for a series of improper statements concerning Ophthotech's clinical trials of Fovista.  In particular, the defendants improperly made statements that claimed the Phase 2b clinical trial showed "breakthrough" and "extraordinary" results for Fovista supported by "well conducted' and "robust" data and that the Phase 3 trial was undertaken with "no meaningful changes to the inclusion and exclusion criteria … used in [the] Phase 2b clinical trial." As detailed below, these and other statements were incorrect.

49.     On March 2, 2015, Ophthotech filed its Annual Report on Form 10-K for the year ended December 31, 2014 with the SEC (the "2014 Form 10-K").  Defendants Guyer, Patel, Bolte, Dyrberg, Galakatos, Ross, and Sblendorio signed the 2014 Form 10-K.  In the 2014 Form 10-K, defendants Guyer, Patel, Bolte, Dyrberg, Galakatos, Ross, and Sblendorio claimed that the Phase 2b trial "demonstrated [the] statistically significant superiority" of Fovista.  They also stated that the Phase 3 trials would incorporate and build on the Phase 2b trial.  In particular, defendants Guyer, Patel, Bolte, Dyrberg, Galakatos, Ross, and Sblendorio stated:

> ***In our completed Phase 2b clinical trial, the combination of 1.5 mg of Fovista and Lucentis demonstrated statistically significant superiority compared to***

*Lucentis monotherapy based on the primary endpoint of mean change in visual acuity from baseline at 24 weeks, providing a 62% comparative benefit from baseline. Our Phase 3 clinical program builds on and incorporates significant aspects from the design of our Phase 2b clinical trial.*

\* \* \*

[T]he following graph sets forth the mean change in visual acuity from baseline for each treatment group in our Phase 2b clinical trial over the course of the trial:



**Mean Change in Visual Acuity (VA) from Baseline Over Time**

*We observed a visual benefit in patients treated with the combination of 1.5 mg of Fovista and Lucentis early in and sustained over the course of treatment. The relative magnitude of visual benefit increased over the study period. We believe that these results suggest that Fovista may provide benefit to patients when used over time in combination with Lucentis.*

50.  In the 2014 Form 10-K, defendants Guyer, Patel, Bolte, Dyrberg, Galakatos, Ross, and Sblendorio specifically stated **multiple times** that the Company "made no meaningful changes to the inclusion and exclusion criteria" used in the Phase 3 trials "from those we used in our Phase 2b clinical trial."  In particular, defendants Guyer, Patel, Bolte, Dyrberg, Galakatos, Ross, and Sblendorio stated:

*While we have modified the methodology used to determine a patient's eligibility under certain of the inclusion and exclusion criteria for our Phase 3 clinical trials as compared to our Phase 2b clinical trial, we have made no meaningful changes to the inclusion and exclusion criteria in these Phase 3 clinical trials from those we used in our Phase 2b clinical trial. We expect that*

*this will result in the enrollment of a patient population similar to the patient population enrolled in our Phase 2b clinical trial*.

\* \* \*

*We have made no meaningful changes to the inclusion and exclusion criteria in these Phase 3 clinical trials from those we used in our Phase 2b clinical trial. However, we have modified the methodology used to determine a patient's eligibility* under certain of the inclusion and exclusion criteria for our Phase 3 clinical trials as compared to our Phase 2b clinical trial. *We are enrolling patients in our Phase 3 clinical program based on a specific definition of the presence of neovascularization based on diagnostic imaging of the retina*. The most commonly employed and standard modality for neovascular AMD imaging in a typical retinal specialty based practice is SD-OCT. Other diagnostic modalities usually employed by many retinal physicians include fluorescein angiogram and fundus photos. *To ensure that uniform criteria are applied in characterizing patients' neovascular lesions, we have engaged a centralized reading center to review the SD-OCT, fluorescein angiogram and fundus photos of each patient's affected eye. The reading center uses these imaging modalities to assess the eligibility of the abnormal new blood vessels at the time of enrollment*.

51.    Defendants Guyer, Patel, Bolte, Dyrberg, Galakatos, Ross, and Sblendorio discussed the process that they would use for "determining whether or not a wet AMD patient has pure occult" lesions.  In doing so, they improperly omitted that the process they would have the Company undertake for the Phase 3 trial was materially different than the process used for the Phase 2b trials.  In particular, defendants Guyer, Patel, Bolte, Dyrberg, Galakatos, Ross, and Sblendorio stated:

...*The process for determining whether or not a wet AMD patient has pure occult choroidal neovascularization has evolved considerably in the United States and European Union over the last five years, with SD-OCT replacing fluorescein angiography as the diagnostic standard*. There is significant variability and inconsistency among physicians and reading centers with respect to the determination of the presence and amount of the occult component of lesions using fluorescein angiography. Different reading centers may categorize a patient differently on the basis of the same image if fluorescein angiography is used to assess the occult component of choroidal neovascularization. *We believe the use of SD-OCT to assess choroidal neovascularization at the time of enrollment in our Phase 3 clinical trials will alleviate some of the variability and inconsistency inherent in using fluorescein angiography. SD-OCT will be used to assess the characteristics of abnormal new vessels, which historically, using fluorescein angiography, have been associated with the subtype occult*

*neovascularization. SD-OCT is the current standard of imaging of wet AMD patients and we believe that the use of SD-OCT will provide a more precise analysis of the anatomical differences between the various angiographic subtypes of CNV lesions in neovascular AMD*.

\* \* \*

*We believe that use of ... the latest imaging technologies enables us to confirm patient eligibility and properly classify neovascular characteristics and the associated leakage in an accurate and standardized manner prior to enrolling them in the trial.*

52.    The Company participated in the Barclays Healthcare Conference, held on March 10, 2015.  Defendant Guyer presented at that conference and reiterated that "*our Phase 2b* ... *demonstrated statistically significant superiority* in a large randomized, controlled ... trial *showing a 62% comparative benefit from baseline over Lucentis standard of care anti-VEGF monotherapy….*"

53.    Two months later, at the Deutsche Bank Health Care Conference held on May 7, 2015, defendant Guyer stated that the "*Phase 2b data demonstrated statistically significant superiority* in ... the largest Phase 2b ever done in AMD, randomized controlled Phase 2b trial, where we *showed a 62% comparative benefit from baseline over standard of care Lucentis anti-VEGF monotherapy*."  Defendant Guyer continued by stating that "we found that *classic dose-response curve with continuing divergence*."

54.    Ophthotech announced in a press release its first quarter for the 2015 fiscal year financial results on May 11, 2015.  The press release noted that the Company completed patient enrollment for the first Phase of the Phase 3 trial on which would be discussed in the ensuing conference call.  In particular, the press release stated:

> As announced today, Ophthotech has completed patient recruitment in the Company's first Phase 3 trial of Fovista in combination with Lucentis (ranibizumab) in wet Age-Related Macular Degeneration (AMD). In addition to announcing this achievement, the Company also provided information pertaining

to the overall Fovista Phase 3 program including additional recruitment timelines. These announcements will be discussed during today's conference call/webcast.

55.     The Company held a conference call that same day for analysts and investors. During that call, defendant Patel responded to questions about the enrollment criteria for the Phase 3 trial by stating that it was "*equivalent*" to the Phase 2b trial criteria.   In particular, defendant Patel's conversation occurred as follows:

Joseph Schwartz – Leerink Partners – Analyst:

...I was wondering, first of all, *how are you selecting patients for inclusion into these Phase 3 trials on top of Lucentis? Is it just classic features of wet AMD or is it the presence of SHRM or both?* Which is believed to correlate stronger with anti- PDGF activity?

\* \* \*

Defendant Patel:

*So, it's SHRM by OCT*....

\* \* \*

Obviously when we started the Phase 3, the use of a fluorescein angiogram, as you know, is quite unusual and rare nowadays. Virtually everybody uses OCT and the OCT is very high resolution, and *its sensitivity and specificity has determined the location of the fluorelier vascularization with respect to the RPE, which is what you are really trying to do when you look at classic [and it] is better and more accurate. So it is for that reason we switched over to using SHRM. In essence, the definition for the use of the term classic refers to fluorescein angiogram. [Its] equivalent component on OCT is called SHRM*.

56.     Defendant Guyer highlighted the results of the Phase 2b clinical trial again at the Bank of America Merrill Lynch Health Care Conference on May 13, 2015.  At the conference, defendant Guyer stated that "*the Phase 2b trial*, the largest ever done in wet AMD ... *demonstrated both statistical and clinical significance* in a superiority trial with Lucentis monotherapy, *showing a 62% comparative benefit from baseline against standard of care Lucentis*...."

57.     Less than a week later, on May 18, 2015, defendant Guyer reiterated these sentiments at the UBS Global Healthcare Conference.   There, defendant Guyer stated that "*[O]ur Phase [2]b Wet AMD Fovista trial* ... was the largest Phase [2]b ever done for macular degeneration, where *we demonstrated a statistically and clinically significant effect in a superiority trial over standard of care anti-VEGF – in this case, Lucentis therapy, showing a 62% comparative benefit over baseline standard of care Lucentis therapy*...."   and that the Phase 2b trial "*hit both statistical and clinical significance with classic dose range finding* and a complete divergence at six month of the curves."

58.     On June 10, 2015, defendants Patel and Guyer participated in a question and answer session at the Goldman Sachs Healthcare Conference.   During that session, defendant Patel spoke about the positive Phase 2b trial results while defendant Guyer explained that the Phase 3 trial looked to repeat the Phase 2b trial's design.   In particular, the following exchanges occurred:

> Terence Flynn – Goldman Sachs – Analyst:
>
> *... Just what was so compelling about the Phase 2 AMD data that you guys originally presented a couple of years ago? Just give us some of the context there for why that data was so interesting. And what drove to the decision to launch into this big Phase 3 program.*
>
> Defendant Patel:
>
> ...*The benefit here not only showed the dose response curve with statistical significance benefits in the high dose compared to monotherapy anti-VEGF,* high dose Fovista in combination with Lucentis versus Lucentis monotherapy for the dose response curve.
>
> And over time, at every time point, there was splitting of the dose as well, and expanding benefit over time. *So obviously, given the statistical trends evidence, it was just a matter of repeating the same trial to maximize the success*. And go over to a longer time when that's required for registration.

*  *  *

Defendant Guyer:

*… So our Phase 3 trials were designed to basically confirm our Phase 2b. The Phase 2b was the largest trial ever done in wet AMD, showed clinical and statistical significance. And our philosophy was to repeat them in the Phase 3 program, and to make all of the aspects of the trial as close to it as possible.*

59.     Defendant Guyer again touted the Phase 2b trial results, this time at the Stifel Healthcare Conference on November 17, 2015.  During the conference, defendant Guyer stated:

...*[O]ur Phase 2b program* [was] the largest Phase 2 ever done in macular degeneration, a superiority trial where we *showed statistical significant superiority* in a 449-patient randomized controlled trial *where Fovista plus Lucentis showed a 62% comparative benefit from baseline over Lucentis monotherapy alone*....

* * *

*If we turn again to our Phase 2b data*, this, again, as I said, was the largest wet AMD Phase 2 ever done, as close to a Phase 3 as one can do. It *showed a classic dose response curve, hit our statistical and clinical significant points, as well as, importantly, [showed] continued divergence throughout the trial. The maximum divergence is at six months*, which is consistent with our mechanisms of action of anti-fibrosis.

60.     In response to questions about the design of the Phase 3 trial, defendant Guyer again claimed that little was changed between the Phase 2 and Phase 3 trials, even chastising companies that do make changes between trials.  In particular, defendant Guyer stated:

As far as the 30 minutes – and again, in our Phase 2 we had the injections given 30 minutes apart because we didn't know if there would be any issues with [intraocular pressure changes]. We saw none. Our main intraocular pressure was well below normal.  …So we really don't think there's any problem. *In the Phase 3*, we kept it 30 minutes because *our mantra is don't change anything. You see too many companies make a lot of changes from Phase 2 to Phase 3, and you get surprises. So we were just being superstitious and changed nothing.*

61.     On December 3, 2015, Ophthotech held a Research and Development Investor Day.  During that conference, defendant Patel touted that the Phase 2b trial showed the superiority of Fovista.  In particular, defendant Patel stated:

- 23 -

So you're obviously aware of our Phase 2B study which was a 449-patient study looking at the combination of Fovista and Lucentis versus monotherapy Lucentis.

\* \* \*

And this was a very large trial, as you know, six months duration and *the benefit of combination therapy over monotherapy was shown with statistical significant superiority of the 1.5 mg of Fovista*.

*And the improvement was early and sustained and continued to expand over time and was not really related to any baseline features that typically drive visual acuity based on prognostic factors such as lesion size, baseline vision and baseline fluid. And all the parameters* that Don talked about earlier *of visual gain and visual loss that are clinically meaningful were consistently on the side of combination therapy.*

62.     During the Oppenheimer Healthcare Conference on December 8, 2015, defendant Guyer again stated that the Phase 2b trial showed Fovista as a statistically significant improvement over the current standard of care.  In addition, defendant Guyer claimed that the Phase 3 trial would "really not change anything at all" from the Phase 2b trial.  In particular, he stated:

Ling Wang – Oppenheimer & Co. – Analyst:

**Great,** *so perhaps you can tell us your highlight of the Phase [2]b data and the ongoing Phase [3] programs, perhaps in terms of the differences and similarities between these two trials.*

Defendant Guyer:

Sure. So *the Phase [3] program is very similar to the Phase [2]b. Our Phase [2]b* was the largest Phase [2] trial ever done in wet AMD, almost as large as a Phase [3]. It *showed a classic dose response curve, as well as clinical and statistical significance over standard of care anti-VEGF monotherapy*.

*We saw a maximum divergence of the curves at the last endpoint, six months, and the Phase [3] program really is to just confirm the Phase [2], really similar in virtually every way short of the regulatory time point of 12 months*, which is needed for regulatory [approval], *versus six months.*

\* \* \*

*But basically, our goal was to confirm the Phase [2], really not change anything at all.*

- 24 -

63.     Defendant Guyer continued to tout the results of the Phase 2b trial at the

JPMorgan Healthcare Conference on January 11, 2016.  In particular, defendant Guyer stated:

> ...***Our Phase 2b***, the largest Phase 2b ever done in this disease ***showed a 62% additional benefit over standard of care monotherapy anti-VEGF therapy***.

* * *

> As most of you are aware, we conducted a ***Phase 2b study***, the largest Phase 2b ever in wet AMD. There ***was a superiority trial*** and we have previously discussed the Phase 2b study, ***which showed a 62% additional benefit over monotherapy anti-VEGF with statistical and clinical significance – a classic dose response curve with an early and sustained improvement. Early separation of the curve at three months increasing to maximum divergence at six months*** and this is with no imbalances in the safety profile, but more important, ***there was no baseline variable where the combination therapy was not superior to monotherapy nor was there a treatment endpoint where the combination was not superior to monotherapy. Therefore, the efficacy of combination therapy was beneficial to all subgroups***.

* * *

> …We are excited by our ***strong results*** in the Phase 2b study and look forward to the potential confirmatory data at year-end. ***The strength of our Phase 2b data*** and the recent new findings with Fovista combination therapy ***are strongly suggestive of the disease modifying properties of Fovista***.

64.     Defendant Patel explicitly stated "there really aren't any differences that are

material or significant in any way" between the Phase 2b and Phase 3 trials at the Leerink

Partners Global Healthcare Conference on February 10, 2016.  Defendant Patel stated:

> Joe Schwartz – Leerink Partners – Analyst:

> And a question we get a lot for any development program, but in particular yours since it was some time since your very large Phase [2] was done, is – ***are there any differences between how the patients are being selected or any other differences in design for the Phase [3] for Fovista relative to the Phase [2]?***

> Defendant Patel:

> ...You know ***as far as differences between the Phase [2]b study and the Phase [3], there really aren't any differences that are material or significant in any way.***

- 25 -

And to be a little more specific about it, *I think one of the questions that often comes up is, is it a broader group of patients that are being studied?*

\* \* \*

*…Now some questions have been raised about subtypes. And by that I really mean presence of neovascularization, whether it's above the retinal pigment epithelium, otherwise known as classic, if you were to look at it by fluorescein angiography, or if you look at it with the current imaging modality, which has high specificity, it's called sub-retinal hyper-reflective material [SHRM] as we are looking at it.*

So, given its high specificity, *that's one change that we made, but it's actually no different in terms of … the type of patients we are putting in.* And I think if somebody wants a proof of that, it's very simple. 93% of the patients in the Phase [2]b study had the presence of sub-retinal hyper-reflective material. And the – given the variability between two physicians reading the fluorescein component of that is almost 30% or 40% in the variability.

*So there are no changes that we can think of that are significant in any way*.

Joe Schwartz – Leerink Partners – Analyst:

Okay. *So there's a lot of concurrence between the previous methodology based on old technology and the current methodology?*

Defendant Patel:

*Yes, that's correct.*

65.     On February 24, 2016, the Company issued a press release discussing its fourth quarter and full year 2015 financial and operating results.  The press release highlighted the "significant progress" the Company made concerning the development of Fovista.  During the earnings conference call with analysts and investors that followed that same day, defendant Patel discussed the delay in the Company publishing its Phase 2b trial results.  By that point, Ophthotech had completed its Phase 2b trial nearly four years earlier.  Defendant Patel claimed that the delay was simply because the Company was focusing on its Phase 3 trial.  In particular, defendant Patel said:

Yigal Nochomovitz – Citigroup – Analyst:

...And obviously you published the Phase 1 data last year. *We've just been getting questions from clients regarding potential to see the Phase 2 study in print. Any plans for that this year?*

Defendant Patel:

We plan to submit the Phase 2 paper, *I think it's just an issue more than anything else of priority and getting the key aspects related to the Phase 3 trial going and subsequently finishing enrollment. That is really responsible for what some may perceive as delay in getting the Phase 2 paper out*. But I can assure you that we've put a lot of effort into it lately and as we added more individuals to our team and we expect to have that submitted very shortly.

66.    During the call, defendants Patel and Guyer responded to analyst questions about potential differences between the Phase 2b and Phase 3 trials.   They both highlighted the similarities between the two trials, stating:

Joseph Schwartz – Leerink Partners – Analyst:

*…I was wondering if you could speak to whether, on a blinded basis, whether the baseline characteristics for the two Phase 3 trials are more or less consistent with Phase 2 and your expectations for who would be enrolled in Phase 3. And whether there are any differences between the two Phase 3 studies*, **again on a blinded basis?** Baseline characteristics only.

Defendant Patel:

...We wouldn't know the baseline characteristics. Of course the [Phase 3] studies, the database hasn't been closed and one of the Phase 3 trial is ongoing. *I think as far as from a general standpoint, the inclusion criteria are quite similar between the Phase 2b and 3 and I think we've addressed that.*

*There's no reason for us to believe that there would be, especially the key characteristics related to baseline vision, lesion compositions and sizes of lesions, et cetera should be quite similar*. And don't forget that the inclusion in this trial just as it was in the Phase 2b, it's done by an independent reading center. *It's the same reading center and that process is probably the single most variable in making sure that the patient characteristics of relevance are similar*.

Defendant Guyer:

I would also just add that the Fovista effect has been very, very broad as we've shown many times. *Any way you cut the data as far as baseline characteristics, as far as (inaudible) endpoints, the Fovista combination group always does*

*better than the anti-VEGF monotherapy control group. As Samir said, while we believe because the criteria are so similar that most likely the patient population should be similar*, because of this very broad effect even in anti-VEGF treatment failures we see an effect in the Fovista expansion trial.

*It really should not matter, we're talking about a drug that we believe will show a broad effect among all comers. And so far that is what the data shows.* We, again, have not seen the baseline demographics; we won't until we get the data and while *we expect them to be close to Phase 2*, what's been very exciting is just how broad the effect of Fovista has looked in both naive and limited data with treatment failures across the board any way you cut the data.

67.     At the RBC Capital Markets Healthcare Conference that same day, defendant Guyer again touted the results for Fovista in the Phase 2b trial.  In particular, defendant Guyer stated:

...[W]e have previously discussed *our Phase 2 trial which showed a 62% additional benefit over monotherapy anti-VEGF with statistical and clinical significance that showed a classic dose response curve with an early and sustained improvement, and early separation of these curves at three months that increased to maximum divergence at our last patient follow-up point of six months. There were no imbalances in the safety profile in this study, but more importantly, there was no baseline variable where the combination therapy was not superior to monotherapy, nor was there a treatment endpoint, where the combination with Fovista was not superior to monotherapy and anti-VEGF. Therefore, the efficacy of combination treatment was focused or was beneficial to all subgroups.*

\* \* \*

…*The strength of our Phase 2b data* and the recent new findings with Fovista combination therapy *are strongly suggestive of the disease-modifying properties of Fovista*.

68.     On February 26, 2016, Ophthotech filed its Annual Report on Form 10-K for the year ended December 31, 2015 with the SEC (the "2015 Form 10-K").  Defendants Guyer, Patel, Bolte, Dyrberg, Galakatos, Redlick, Ross, and Sblendorio signed the 2015 Form 10-K. The 2015 Form 10-K highlighted the results of the Phase 2b trial and its similarity to the ongoing Phase 3 trials.  In particular, in the 2015 Form 10-K, defendants Guyer, Patel, Bolte, Dyrberg, Galakatos, Redlick, Ross, and Sblendorio stated:

*In our completed Phase 2b clinical trial, the combination of 1.5 mg of Fovista and Lucentis demonstrated statistically significant superiority compared to Lucentis monotherapy based on the primary endpoint of mean change in visual acuity from baseline at 24 weeks, providing a 62% comparative benefit from baseline. Our Phase 3 clinical program builds on and incorporates significant aspects from the design of our Phase 2b clinical trial*.

\*   \*   \*

[T]he following graph sets forth the mean change in visual acuity from baseline for each treatment group in our Phase 2b clinical trial over the course of the trial:

**Mean Change in Visual Acuity (VA) from Baseline Over Time**



*We observed a visual benefit in patients treated with the combination of 1.5 mg of Fovista and Lucentis early in and sustained over the course of treatment. The relative magnitude of visual benefit increased over the study period. We believe that these results suggest that Fovista may provide benefit to patients when used over time in combination with Lucentis.*

69.     The 2015 Form 10-K again claimed, among other things, that there were "no meaningful changes to the inclusion and exclusion criteria in these Phase 3 clinical trials from those we used in our Phase 2b clinical trial."   In particular, defendants Guyer, Patel, Bolte, Dyrberg, Galakatos, Redlick, Ross, and Sblendorio claimed in the 2015 Form 10-K that:

*While we have modified the methodology used to determine a patient's eligibility* under certain of the inclusion and exclusion criteria for our Phase 3 clinical trials as compared to our Phase 2b clinical trial, *we have made no*

*meaningful changes to the inclusion and exclusion criteria in these Phase 3 clinical trials from those we used in our Phase 2b clinical trial. We expect that this will result in the enrollment of a patient population similar to the patient population enrolled in our Phase 2b clinical trial*.

\* \* \*

*We have made no meaningful changes to the inclusion and exclusion criteria in these Phase 3 clinical trials from those we used in our Phase 2b clinical trial. However, we have modified the methodology used to determine a patient's eligibility* under certain of the inclusion and exclusion criteria for our Phase 3 clinical trials as compared to our Phase 2b clinical trial. For our Phase 2b trial, we assessed patient eligibility based on the fluorescein angiographic pattern of the choroidal neovascular membrane. Since the most commonly employed modality for imaging, diagnosing and managing neovascular AMD is currently SD-OCT, *we have modified the methodology to determine the patient's eligibility to include SD-OCT criteria. To ensure that uniform criteria are applied in characterizing patients' neovascular lesions, we have engaged a centralized reading center to review the SD-OCT, fluorescein angiograms and fundus images of each patient's affected eye*. …*For our Phase 3 clinical trials, the reading center uses all three of these imaging modalities, fluorescein angiography, SD-OCT and fundus images, to assess the eligibility of patients based on the presence of abnormal new blood vessels relative to the RPE at the time of enrollment.*

70.   The 2015 Form 10-K reiterated the 2014 Form 10-K's description on the technology used to detect lesion characteristics.  In particular, defendants Guyer, Patel, Bolte, Dyrberg, Galakatos, Redlick, Ross, and Sblendorio stated:

*...The process for determining whether or not a wet AMD patient has pure occult choroidal neovascularization has evolved considerably in the United States and European Union over the last five years, with SD-OCT replacing fluorescein angiography as the diagnostic standard.* There is significant variability and inconsistency among physicians and reading centers with respect to the determination of the presence and amount of the occult component of lesions using fluorescein angiography. Different reading centers may categorize a patient differently on the basis of the same image if fluorescein angiography is used to assess the occult component of choroidal neovascularization. *We believe the use of SD-OCT to assess choroidal neovascularization at the time of enrollment in our Phase 3 clinical trials will alleviate some of the variability and inconsistency inherent in using fluorescein angiography. SD-OCT will be used to assess the characteristics of abnormal new vessels, which historically, using fluorescein angiography, have been associated with the subtype occult neovascularization. SD-OCT is the current standard of imaging of wet AMD patients and we believe that the use of SD-OCT will provide a more precise*

- 30 -

*analysis of the anatomical differences between the various angiographic subtypes of CNV lesions in neovascular AMD.*

\*  \*  \*

*We believe that use of ... the latest imaging technologies enables us to confirm patient eligibility and properly classify neovascular characteristics and the associated leakage in an accurate and standardized manner prior to enrolling patients in the trial.*

71.    On May 4, 2016, the Company reported its first quarter for the 2016 fiscal year earnings.   That same day, the Company held an earnings conference call with analysts and investors.   During that call, defendant Patel claimed that, just like in the Phase 2 trial, "[t]here is no occult in our pivotal study."   In particular, he stated:

<u>Gbola Amusa – Chardan Capital Markets – Analyst</u>:

...Sorry to rehash an old topic, but our conversations with investors seems to touch on investor questions about *the composition of your trials, but with regards to occult versus classic patients. As you're getting close to completing enrollment, could you tell us what percentage of your patients have occult wet AMD and if you wouldn't mind just frame the issue just so we can understand ... where you are in Phase [3] versus Phase [2b].*

<u>Defendant Patel</u>:

...It's been addressed multiple times and nothing has changed. *It's a very simple answer. There is no occult in our pivotal [Phase 3] study like [the] Phase [2b] study as well.* So I think it's sufficed to state *the definition of occult requires [fluorescein] angiogram*, and by definition that would make sure that somebody saying occult included is when you don't use fluorescein how can that statement be made.  So it doesn't – we don't understand it.  It doesn't make any sense.

Secondly, *the [SHRM] material*, which we've covered, which is the entry point is – requires patients that have neo-vascular complex according to its definition above the RPE. *That would itself, by analogy, preclude occult*. So I can't really give any further guidance where the perception that there is occult comes from.

72.    Defendant Patel again touted Fovista's results in the Phase 2b trial at the Goldman Sachs Global Healthcare Conference on June 7, 2016.   Further, he emphasized that there was "no material changes" in the patient criteria between Phase 2b and Phase 3 trials and

again explicitly denied that patients with pure occult lesions were eligible for inclusion in the

Phase 3 trial.  In particular, defendant Patel stated:

<u>Defendant Patel</u>:

***...So, for us to have had a statistically significant benefit with respect to superiority of a[n] approximately four-letter benefit, which translate into 62% additional efficacy from baseline, it's very exciting.***

***And all the clinically meaningful endpoints that are typically looked at*** – three, four, five lines of vision gain; 20/40 or better; 20/25 or better – ***all were on the side of benefit of Fovista. It gives you a great deal of confidence about the clinical meaningfulness, clinical significance and robustness of the data***.

\* \* \*

<u>Terence Flynn – Goldman Sachs – Analyst</u>:

...***Maybe as you compare the Phase 2 to the Phase 3, remind us what some of the changes were***. I think one was duration.  Obviously you touched on this. But ***any other key changes that were made? I know your goal is to reproduce as much as possible, but*** as we think about similarities, differences, between the Phase 2 and the Phase 3 program, maybe ***just remind us what some of the differences are***.

<u>Defendant Patel</u>:

...[S]o, ***we've worked pretty hard in trying to keep virtually all the parameters the same. I think that, if you look at the entry criteria for vision***; if you look at – of course, we had to increase the number of sites, because it's a higher sample size study. I think that's a bit different. But ***virtually anything that's material is – has been kept the same***.

...***[A] lot of people have pointed out that perhaps occults are being enrolled in the trial, and it's simply not the case***, because what – ***the definition of occult is driven by fluorescein angiogram***, and when we started the study, the Phase 2b study, OCT was not used ubiquitously [as] standard of care for imaging.

It is now, and it would be very unusual – in fact, physicians have come out and told us that to use fluorescein to enter patients commercially – not be the right thing to do.  And in fact, given the specificity, it measures the lesions – ***for the type of lesions that we were looking at in the Phase 2, it's identical.  So, it's not really an issue***.

***So, we've gone through great care of making sure virtually all material aspects of the trials – inclusion, exclusion, and it's the same reading center. So, we feel very good about it.***

And if you look at this point last (inaudible) – if you look, for example, in anti-VEGF monotherapy trials, you'll see a great deal of variability on how the lesions are read in terms of its size based on fluorescein. And it's a very noisy test.  So, I'm just touching upon that, because *some people have brought up the issue that maybe – that there are some changes; but really [there] are no material changes*.

Terence Flynn – Goldman Sachs – Analyst:

So, you think by using OCT you have a more homogeneous population? Is that the right way to think about it...?

Defendant Patel:

...*[F]irst of all, I think it's very important to understand that in none of the trials at all has there been any changes*, one can say that subtypes really matter. They don't when you adjust them for size.

73.     On June 20, 2016, Ophthotech issued a press release announcing that the Company had completed patient enrollment in the Fovista Phase 3 trial.

74.     On August 3, 2016, the Company issued a press release announcing its financial results for the second quarter of the 2016 fiscal year.  That same day, Ophthotech held an earnings conference call with analysts and investors.  In response to an analyst question, defendant Patel disagreed that the Lucentis monotherapy group (the control group) had underperformed in the Phase 2b trial.  In addition, he called it "irrational" that the results would not be the same in the Phase 3 trial because "baseline variables" were "similar."  In particular, defendant Patel stated:

Brett Larson – Leerink Partners – Analyst:

...First on Fovista, *when considering the Phase 2b results, to assess what results do we expect from these upcoming Phase 3 studies, we've heard consistently from investors and clinicians that* they recognize there are two key characteristics that – one providing tailwind, one the other headwinds to achieving comparable efficacy, one being that *patients showed lower visual acuity gains in the Lucentis arm of the Phase 2 study than one might have expected compared to other studies that have been conducted*. But on the other hand, now you have a trial endpoint that is one year versus six months previously. *So I'd love to hear your thoughts on how significant of a driver one of these factors is versus*

- 33 -

*another, and if there are any other key characteristics that have changed leading to these Phase 3 results that you'd like to highlight, that increase or temper your confidence*.

<u>Defendant Patel:</u>

* * *

*So the underperformance, which is what you are referring to, we think that's quite irrational*. First, cross-trial comparisons are not scientifically valid so that in it itself is, you know, we think not really valid. *Secondly, I think to say that one arm underperformed, but somehow magically the combination arm wouldn't in a very large trial where this randomization and baseline variables are similar, that would be quite irrational*.

75.     Defendant Patel dismissed concerns that the Phase 2b and Phase 3 trials might have different outcomes during the Morgan Stanley Global Healthcare Conference on September 13, 2016.  In particular, defendant Patel stated:

<u>Matthew Harrison – Morgan Stanley – Analyst:</u>

...*So then a couple key questions that we get around differences between Phase 2 and Phase 3*, maybe if we could just talk about them. One that's, I think, probably highlighted ... more by competitors in the marketplace, but I think it has become an investor question because of that. Is that *you saw 4-letter difference in Phase 2*.  Some people point to the fact that that's within the range of variability of differences that you see between different studies. So I guess the question is, *how confident do you feel in that result that you saw in Phase 2, and that it's not just, as some people might suggest, due to variability in the reading*.

<u>Defendant Patel:</u>

...*[A] difference of 4 letters, I think, it's been stated recently quite well that that's a remarkable difference, especially when you have 62% additional efficacy from baseline*. So each trial has to look at the relative benefit compared to its own. And when we talk about variability, the variability is already taken into account when you have variance in the measurement that's measuring, and standard deviations, et cetera.  So statistical significance already takes that into account.

*So when we say a 4-letter difference, we're saying it's 4 letters and real for that particular trial*, if it's conducted with adequate power and adequate conduct. And that analysis – *and if you take the Phase 2 study, for example, that 4 letters led to remarkable differences in three, four and five lines of vision gained*, 20/40 or better, 20/25 or better, 20/125 or worse. *So these are really clinically meaningful*

- 34 -

*end points and there was a significant difference between the groups.  So that's what the 4 letters translate into*.

So in summary, yes, it is true that two different trials can give you different numbers.  But that's sort of like saying, if you had blood pressure measurement to do in oncology, two different oncology trials, your baseline and final blood pressures may be very different.

76.     During this conference, analysts asked defendant Patel whether "additional criteria, such as SHRM" in the Phase 3 trial "could lead to "potential difference[s] [in] baseline characteristics between Phase 2 and Phase 3" trials.  Defendant Patel dismissed those concerns by claiming there was an "almost identical" design of the trials.  Further, defendant Patel stated that it was "simply not true" that patients with pure occult lesions were eligible for inclusion in the Phase 3 trial.  In particular, defendant Patel stated:

Matthew Harrison – Morgan Stanley – Analyst:

...*Can we talk a little bit about baseline characteristics?* I think it's another area that people try and understand.  And so *I think you've added some additional criteria, such as SHRM and some other things to Phase 3. Can you just talk about why you did that and then what the difference is, or the potential difference between baseline characteristics between Phase 2 and Phase 3*, and what the reasoning for that was?

Defendant Patel:

...So just as a general matter, I mean I think, at least from other trials that I'm used to, at least to the best of my knowledge, *it's quite rare to have a Phase 3 be as analogous and almost identical to a Phase 2 as ours is*.

\*   \*   \*

*So it's quite remarkable. To the best of my knowledge, at least in ophthalmology, this is about as close as you can get, where the Phase 3 is like the Phase 2. And I could argue that's probably the case in all therapeutic areas, when you compare the Phase 2 and Phase 3. So it's remarkable.  It's almost identical.*

\*   \*   \*

As far as the patients are concerned, absolutely we think that – first of all, *it's a misconception to think that all comers operate in the Phase 3. It's simply not true*. What the – as *the OCT and the definitions that is used for the subretinal*

*hyper-reflective material [SHRM] is the same as the presence of what the classic conveys by fluoranthene angiogram.* That is the presence of neovascularization above the RPE and below the photoreceptor. We just call classic by fluoranthene.

And our definition by the same reading center, *using these [SD-OCT] are the same group of patients. And that's been looked at by the reading center*.

\* \* \*

*What is relevant for the investors here is to understand that this particular reading center is using the same definition of the presence of neovascularization over the RPE. And there's no reason for us to believe that that constitutes a different group of patients.*

77. On October 31, 2016, Ophthotech issued a press release announcing that the Phase 2b trial had finally been published in *Ophthalmology*, the journal of the American Academy of Ophthalmology. The press release reiterated that "*[p]atients receiving the combination of Fovista® (1.5 mg) and Lucentis® (0.5 mg) gained a mean of 10.6 letters of vision on the ETDRS standardized chart at 24 weeks, compared to 6.5 letters for patients receiving Lucentis® monotherapy (p=0.019). This represents a 62% additional benefit from baseline*." In the press release, defendant Patel stated:

> ...*The strength of results* of this large trial represent the basis for our Fovista® in combination with anti-VEGF therapy Phase 3 registration program for the treatment of wet AMD.

Also, in the press release, defendant Guyer stated:

> We would like to thank all the participating physicians, patients and their staff for their splendid effort in this *well conducted trial*.

78. The trial revealed for the first time that there was a 17% baseline imbalance in lesion size between patients in the Lucentis control group and patients in the Fovista combination group. In particular, the control group patients had total lesion sizes of 1.8, whereas the 1.5 mg combination group's total lesion size was only 1.5. Investors were rightly concerned about this difference in lesion size. For instance, October 31, 2016, analyst reports

from Chardan and BTIG both noted that "bears" highlighted the smaller baseline lesion size for the 1.5mg Fovista group.

79. During the Company's earnings conference call for the third quarter of fiscal year 2016 held on November 8, 2016, defendant Patel attempted to address these "bears" by asserting that there was "no validity" to the idea that lesion size impacted the Phase 2b data. In particular, in response to questions about the results, defendant Patel stated:

Unidentified Participant – Analyst:

***...A lot of investors have been focused on baseline imbalance and lesion size as … impacting the strength of the Phase 2 data. Could you give your views on how important lesion size is as a prognostic factor in these trials, and if you think that impacted the Phase 2 data?***

Defendant Patel:

***First, I think the publication speaks for itself. There's no discussion of that. It's a very – it's a top journal****.* You would expect that something – ***I think that tells you there is no validity to the statement of impact of the data because of lesion size measurement in itself****.* Just to give you some background.

***I don't know why someone would think that would affect at that level in terms of a one-to-one correlation with lesion size, nor are we aware of any uniform or constant or consistent trends.***

## THE TRUTH IS REVEALED

80. On December 12, 2016, before the markets opened, Ophthotech shocked the market when it revealed that the Phase 3 trial results showed "[n]o benefit observed." In particular, the Phase 3 trial showed that patients who received Fovista in combination with Lucentis had a nonstatistically significant improvement over the control group. In particular, The press release stated:

Ophthotech ... today announced that ***the pre-specified primary endpoint of mean change in visual acuity at 12 months was not achieved in its two pivotal Phase 3 clinical trials*** investigating the superiority of Fovista® (pegpleranib) anti-PDGF therapy in combination with Lucentis® (ranibizumab) anti-VEGF therapy compared to Lucentis® monotherapy for the treatment of wet age-related macular

degeneration (AMD). *The addition of Fovista® to a monthly Lucentis® regimen did not result in benefit as measured by the mean change in visual acuity at the 12 month time point*.

\* \* \*

*The combined analysis from the two trials (OPH1002 and OPH1003) showed that patients receiving Fovista® combination therapy gained a mean of 10.24 letters of vision on the Early Treatment of Diabetic Retinopathy Study (ETDRS) standardized chart at 12 months, compared to a mean gain of 10.01 ETDRS letters for patients receiving Lucentis® monotherapy, a difference of 0.23 ETDRS letters*. In OPH1002, consisting of 619 treated patients, subjects receiving Fovista® combination therapy gained a mean of 10.74 letters of vision on the ETDRS standardized chart at 12 months, compared to a mean gain of 9.82 ETDRS letters in patients receiving Lucentis® monotherapy, a resulting difference of 0.92 ETDRS letters (p=0.44). In OPH1003, consisting of 626 treated patients, subjects receiving Fovista® combination therapy gained a mean of 9.91 letters of vision on the ETDRS standardized chart at 12 months, compared to a mean gain of 10.36 ETDRS letters in patients receiving Lucentis® monotherapy, a resulting difference of -0.44 ETDRS letters (p=0.71). *None of these results of the pre-specified primary efficacy analysis were statistically significant*.

81.     In response to this news, the price of Ophthotech market capitalization fell approximately *86%* from a value of almost $1.4 billion on Friday, December 9, 2016, to less than $200 million on Monday, December 12, 2016. The price of Ophthotech common stock has continued to decline and now trades at under $3 per share, a market capitalization of only $87.6 million.

82.     Analysts were surprised by the results of the Phase 3 trial. For example, a December 12, 2016 BTIG analyst report stated that "[w]e are obviously surprised and disappointed in the results, given the robust Phase [2b] data," and a Leerink analyst report issued the same day noted that "[t]hese are unexpected results that were not in line with our expectations." A JP Morgan report issued that day noted that "many of the key bear-theses played out" and "[c]learly, these results are a major setback for the company…Given the Fovista setback, we do not see many value creation catalysts in the near-term." The JP Morgan

analyst noted late that "Clearly, the Fovista results are a major setback.  Looking forward, we see few value creation catalysts and note the Street ascribes little value to Zimura."

83.     A December 13, 2016 Gabelli & Company analyst report stated: "*[W]e considered the potential causes for concern*," including Ophthotech "*management significantly reducing their ownership stake ahead of results[], but ultimately we chose to believe that these elements could be explained away in the face of what looked like impressive Phase [2b] results.  Rather than being red herrings, these were red flags.... Fovista simply doesn't work*."  The report concluded that "at this point it appears that the Fovista program ... is dead," and "we see little reason to own shares...."

84.     After the Company released the results of the Phase 3 study, experts were able to review and see the errors the Individual Defendants made.  For instance, Dr. Philip Rosenfeld spoke at an industry conference about the failure of Fovista and noted, "[t]hey designed what they thought was a successful phase 2 and then they changed the entry criteria to go to the phase 3.  Never do that.  You can't change what you think worked and hope that works in the phase 3….  They gambled on 1,800 patients, and they failed."

## REASONS THE STATEMENTS WERE IMPROPER

85.     The statements referenced above concerning the Phase 2b trial results were improper when made.  The Phase 2b trial results were not indicative of Fovista's efficacy because the patients in the Lucentis control group had larger lesions and poorer vision at baseline than patients in the Fovista combination group.

86.     The statements referenced above concerning the Phase 3 trial were improper when made.  In particular, the enrollment criteria between Phase 2b and Phase 3 were materially different.  The Phase 2b trial excluded patients with pure occult lesions.  The Phase 3 trial,

however, by requiring only the presence of SHRM for enrollment, permitted the inclusion of patients with pure occult lesions.  As a result of the changes in enrollment methodology, 40% of wet AMD patients with pure occult lesions were eligible to participate in the Phase 3 trial.  In addition, the statements that compared or claimed SHRM was "equivalent" to classic lesions was improper because SHRM may be present in patients whose lesions have either classic or occult components—including patients with pure occult lesions.

## INSIDER SALES BY DEFENDANTS PATEL, GUYER, GALAKATOS, SBLENDORIO, AND DYRBERG

87.    Rather than providing the market with correct information, the Insider Selling Defendants, defendants Patel, Guyer, Galakatos, Sblendorio and Dyrberg, used their knowledge of Ophthotech's material, nonpublic information to sell their personal holdings while Ophthotech's stock was artificially inflated.  As officers and directors of Ophthotech, the Insider Selling Defendants were privy to material, nonpublic information about Ophthotech's true business health.

88.    While in possession of this knowledge, defendant Patel disposed of 555,928 shares of his personally held Ophthotech stock for proceeds of almost $22.9 million.  The amount of stock defendant Patel sold during this period is 3.4 times the amount he sold during the same amount of time immediately before the improper statements began (only 162,711 shares, worth approximately $5.7 million, a quarter what he sold during the improper statement period).  While defendant Patel's sales were made pursuant to a Rule 10b5-1 trading plan, defendant Patel adopted that plan on March 13, 2015, less than two weeks after the first improper statement.  He then began selling stock just a month later, on April 17, 2015.  Defendant Patel also adopted a 10b5-1 trading plan on December 4, 2015, in order to sell even more of his stock,

even though he was still selling stock pursuant to the previous trading plan he adopted.  In total, defendant Patel sold over 76% of his personally held stock.

89.     While in possession of this knowledge, defendant Guyer sold 438,809 shares of his personally held Ophthotech stock for proceeds of over $22.6 million.  The amount of stock defendant Guyer sold during this period is almost 2.5 times the amount he sold during the same amount of time immediately before the improper statements began (only 176,533 shares, worth approximately $7 million, one-third the dollar amount he sold during the improper statement period).  While defendant Guyer's sales were made pursuant to a Rule 10b5-1 trading plan, a substantial portion of these sales were made pursuant to a plan defendant Guyer adopted on August 7, 2015, in the middle of improper statements.  In total, defendant Guyer sold over 99% of his personally held stock.

90.     While in possession of this knowledge, defendant Galakatos sold 12,000 shares of his personally held Ophthotech stock for proceeds of over $740,000.  While defendant Galakatos' sales were made pursuant to a Rule 10b5-1 trading plan, a substantial portion of these sales were made pursuant to a plan defendant Galakatos adopted on September 10, 2015, in the middle of improper statements.  Further, the sales began less than two months later on November 2, 2015. In total, defendant Galakatos sold over 44% of his personally held stock.

91.     While in possession of this knowledge, defendant Sblendorio sold 5,671 shares of his personally held Ophthotech stock for proceeds of over $400,000.  Defendant Sblendorio's stock sales represent 84% of his holdings.  Making these sales particularly suspicious, defendant Sblendorio's sales occurred in July and December of 2015, six months and eleven months after he joined the Company.  It is telling that a top executive of the Company was selling such a large percentage of his stock so soon after joining Ophthotech.

92.     Defendant Dyrberg was CEO of Novo A/S until 2015, when he became managing partner of Novo Ventures.  In 2015, and just a few days after the first improper statement, defendant Dyrberg permitted or caused Novo A/S to sell over one million shares of the Company stock for proceeds of over $52 million, on March 5, 2015.  A year later, while the stock was still inflated due to the improper statements, Novo A/S sold another 1.3 million shares for $63.7 million in proceeds.  In total, Novo A/S sold 2,305,000 shares in two sales for total proceeds of $115.7 million.  During this period, Novo A/S sold almost 39% of its stock, more than twice the percentage it sold during the same amount of time immediately preceding the improper statements (14.4%).  In addition, the $115.7 million worth of stock Novo A/S sold dwarfs the approximately $40 million worth of stock it sold during the same amount of time immediately preceding the improper statements.

93.     In sum, defendants Patel, Guyer, Galakatos, Sblendorio, and Dyrberg sold over $162 million worth of stock at artificially inflated prices as detailed by the table below:

| Insider Last Name | Transaction Date | Transaction Code | Shares | Price | Proceeds |
|---|---|---|---|---|---|
| PATEL Co-Founder; Former President & Director | 4/17/2015 | S | 11,300 | $50.43 | $569,859.00 |
| | 4/17/2015 | S | 700 | $51.09 | $35,763.00 |
| | 5/18/2015 | S | 10,700 | $51.93 | $555,651.00 |
| | 5/18/2015 | S | 1,300 | $52.19 | $67,847.00 |
| | 6/18/2015 | S | 8,100 | $49.60 | $401,760.00 |
| | 6/18/2015 | S | 3,900 | $50.14 | $195,546.00 |
| | 7/20/2015 | S | 10,298 | $67.26 | $692,643.48 |
| | 7/20/2015 | S | 11,663 | $67.95 | $792,500.85 |
| | 7/20/2015 | S | 4,954 | $68.80 | $340,835.20 |
| | 7/20/2015 | S | 300 | $70.19 | $21,057.00 |
| | 8/20/2015 | S | 9,630 | $47.80 | $460,314.00 |
| | 8/20/2015 | S | 9,643 | $48.96 | $472,121.28 |
| | 8/20/2015 | S | 7,942 | $49.63 | $394,161.46 |
| | 9/21/2015 | S | 11,601 | $45.26 | $525,061.26 |
| | 9/21/2015 | S | 4,300 | $46.14 | $198,402.00 |
| | 9/21/2015 | S | 10,814 | $47.45 | $513,124.30 |
| | 9/21/2015 | S | 500 | $49.24 | $24,620.00 |
| | 10/21/2015 | S | 8,300 | $42.52 | $352,916.00 |
| | 10/21/2015 | S | 13,556 | $43.27 | $586,568.12 |

| | | | | |
|---|---|---|---|---|
| 10/21/2015 | S | 5,259 | $44.44 | $233,709.96 |
| 10/21/2015 | S | 100 | $45.19 | $4,519.00 |
| 11/5/2015 | S | 12,822 | $53.06 | $680,335.32 |
| 11/5/2015 | S | 4,200 | $53.95 | $226,590.00 |
| 11/5/2015 | S | 3,665 | $54.80 | $200,842.00 |
| 11/24/2015 | S | 19,371 | $60.14 | $1,164,971.94 |
| 11/24/2015 | S | 7,844 | $60.60 | $475,346.40 |
| 12/24/2015 | S | 9,100 | $76.42 | $695,422.00 |
| 12/24/2015 | S | 14,636 | $77.32 | $1,131,655.52 |
| 12/24/2015 | S | 2,100 | $78.20 | $164,220.00 |
| 12/24/2015 | S | 200 | $79.02 | $15,804.00 |
| 12/29/2015 | S | 560 | $77.00 | $43,120.00 |
| 12/29/2015 | S | 624 | $77.95 | $48,640.80 |
| 1/4/2016 | S | 677 | $71.15 | $48,168.55 |
| 1/4/2016 | S | 472 | $71.93 | $33,950.96 |
| 1/4/2016 | S | 881 | $72.93 | $64,251.33 |
| 1/4/2016 | S | 454 | $74.05 | $33,618.70 |
| 1/4/2016 | S | 85 | $74.96 | $6,371.60 |
| 1/29/2016 | S | 11,418 | $53.33 | $608,921.94 |
| 1/29/2016 | S | 8,482 | $53.92 | $457,349.44 |
| 1/29/2016 | S | 100 | $54.69 | $5,469.00 |
| 2/29/2016 | S | 18,065 | $45.04 | $813,647.60 |
| 2/29/2016 | S | 1,935 | $45.92 | $88,855.20 |
| 3/29/2016 | S | 8,603 | $40.83 | $351,260.49 |
| 3/29/2016 | S | 5,118 | $42.05 | $215,211.90 |
| 3/29/2016 | S | 6,279 | $43.07 | $270,436.53 |
| 4/29/2016 | S | 18,435 | $46.71 | $861,098.85 |
| 4/29/2016 | S | 1,565 | $47.78 | $74,775.70 |
| 5/31/2016 | S | 1,674 | $52.03 | $87,098.22 |
| 5/31/2016 | S | 14,317 | $53.33 | $763,525.61 |
| 5/31/2016 | S | 3,709 | $53.81 | $199,581.29 |
| 5/31/2016 | S | 300 | $54.09 | $16,225.50 |
| 6/29/2016 | S | 18,385 | $51.37 | $944,437.45 |
| 6/29/2016 | S | 1,615 | $51.94 | $83,883.10 |
| 6/30/2016 | S | 19,146 | $50.94 | $975,297.24 |
| 6/30/2016 | S | 2,700 | $51.86 | $140,022.00 |
| 7/29/2016 | S | 15,500 | $64.09 | $993,395.00 |
| 7/29/2016 | S | 4,500 | $64.62 | $290,790.00 |
| 8/10/2016 | G | 30,000 | $0.00 | $0.00 |
| 8/11/2016 | G | 90,000 | $0.00 | $0.00 |
| 8/29/2016 | S | 20,000 | $52.80 | $1,056,000.00 |
| 9/29/2016 | S | 7,292 | $54.13 | $394,715.96 |
| 9/29/2016 | S | 2,612 | $54.93 | $143,477.16 |
| 9/29/2016 | S | 8,096 | $55.75 | $451,352.00 |
| 9/29/2016 | S | 2,000 | $56.90 | $113,800.00 |
| | **Total** | **544,397** | **Total** | **$22,872,916.21** |
| | | | | |

| | | | | | |
|---|---|---|---|---|---|
| **GUYER Current Executive Chairman & Co-Founder** | 3/2/2015 | S | 14,411 | $53.05 | $764,503.55 |
| | 3/2/2015 | S | 4,171 | $53.82 | $224,483.22 |
| | 3/30/2015 | S | 16,782 | $48.19 | $808,724.58 |
| | 3/30/2015 | S | 1,800 | $48.94 | $88,092.00 |
| | 4/29/2015 | S | 12,660 | $48.13 | $609,325.80 |
| | 4/29/2015 | S | 5,582 | $49.09 | $274,020.38 |
| | 4/29/2015 | S | 340 | $49.85 | $16,949.00 |
| | 5/28/2015 | S | 2,400 | $47.40 | $113,760.00 |
| | 5/28/2015 | S | 10,264 | $48.64 | $499,240.96 |
| | 5/28/2015 | S | 5,918 | $49.09 | $290,514.62 |
| | 6/29/2015 | S | 10,581 | $50.71 | $536,562.51 |
| | 6/29/2015 | S | 8,001 | $51.51 | $412,131.51 |
| | 7/30/2015 | S | 5,300 | $65.79 | $348,687.00 |
| | 7/30/2015 | S | 11,488 | $66.44 | $763,262.72 |
| | 7/30/2015 | S | 1,794 | $67.15 | $120,467.10 |
| | 8/31/2015 | S | 10,084 | $44.54 | $449,090.94 |
| | 8/31/2015 | S | 8,498 | $45.30 | $384,959.40 |
| | 9/29/2015 | S | 5,915 | $36.37 | $215,128.55 |
| | 9/29/2015 | S | 3,953 | $37.40 | $147,842.20 |
| | 9/29/2015 | S | 6,180 | $38.57 | $238,362.60 |
| | 9/29/2015 | S | 2,534 | $39.11 | $99,104.74 |
| | 10/30/2015 | S | 18,482 | $49.88 | $921,882.16 |
| | 10/30/2015 | S | 100 | $50.27 | $5,027.00 |
| | 11/30/2015 | S | 2,371 | $61.08 | $144,820.68 |
| | 11/30/2015 | S | 9,135 | $62.15 | $567,740.25 |
| | 11/30/2015 | S | 5,049 | $63.23 | $319,248.27 |
| | 11/30/2015 | S | 2,027 | $63.80 | $129,322.60 |
| | 12/30/2015 | S | 11,631 | $78.53 | $913,382.43 |
| | 12/30/2015 | S | 6,951 | $79.31 | $551,283.81 |
| | 1/4/2016 | S | 862 | $71.15 | $61,331.30 |
| | 1/4/2016 | S | 600 | $71.93 | $43,158.00 |
| | 1/4/2016 | S | 1,121 | $72.93 | $81,754.53 |
| | 1/4/2016 | S | 578 | $74.05 | $42,800.90 |
| | 1/4/2016 | S | 108 | $74.96 | $8,095.68 |
| | 1/28/2016 | S | 14,198 | $53.35 | $757,463.30 |
| | 1/28/2016 | S | 3,200 | $54.10 | $173,120.00 |
| | 1/28/2016 | S | 600 | $55.03 | $33,018.00 |
| | 1/28/2016 | S | 600 | $56.29 | $33,774.00 |
| | 3/1/2016 | S | 3,000 | $44.61 | $133,830.00 |
| | 3/1/2016 | S | 16,592 | $45.53 | $755,433.76 |
| | 3/1/2016 | S | 2,468 | $46.21 | $114,046.28 |
| | 4/1/2016 | S | 2,110 | $41.98 | $88,577.80 |
| | 4/1/2016 | S | 3,500 | $43.21 | $151,235.00 |
| | 4/1/2016 | S | 12,969 | $44.43 | $576,212.67 |
| | 4/1/2016 | S | 3,481 | $45.09 | $156,958.29 |
| | 5/2/2016 | S | 17,421 | $46.01 | $801,540.21 |
| | 5/2/2016 | S | 4,639 | $46.82 | $217,197.98 |
| | 6/1/2016 | S | 25,766 | $52.59 | $1,355,033.94 |

| | | | | | |
|---|---|---|---|---|---|
| | 6/1/2016 | S | 4,294 | $53.44 | $229,471.36 |
| | 7/1/2016 | S | 5,300 | $51.13 | $270,989.00 |
| | 7/1/2016 | S | 17,960 | $52.38 | $940,744.80 |
| | 7/1/2016 | S | 800 | $52.75 | $42,200.00 |
| | 8/1/2016 | S | 21,255 | $64.39 | $1,368,609.45 |
| | 8/1/2016 | S | 2,805 | $65.06 | $182,493.30 |
| | 9/1/2016 | S | 24,060 | $52.58 | $1,265,074.80 |
| | 10/3/2016 | S | 13,828 | $44.00 | $608,432.00 |
| | 10/3/2016 | S | 6,632 | $44.77 | $296,914.64 |
| | 10/3/2016 | S | 1,600 | $45.97 | $73,552.00 |
| | 11/1/2016 | S | 10,530 | $34.93 | $367,812.90 |
| | 11/1/2016 | S | 7,710 | $35.93 | $277,020.30 |
| | 11/1/2016 | S | 3,820 | $36.86 | $140,805.20 |
| | | **Total** | **438,809** | **Total** | **$22,606,621.97** |
| | | | | | |
| **GALAKATOS Former Director** | 11/2/2015 | S | 1,000 | $54.00 | $54,000.00 |
| | 11/2/2015 | S | 500 | $54.00 | $27,000.00 |
| | 11/9/2015 | S | 1,000 | $60.00 | $60,000.00 |
| | 11/9/2015 | S | 500 | $60.00 | $30,000.00 |
| | 11/10/2015 | S | 1,000 | $59.69 | $59,690.00 |
| | 11/10/2015 | S | 500 | $58.69 | $29,345.00 |
| | 11/18/2015 | S | 1,000 | $60.00 | $60,000.00 |
| | 11/18/2015 | S | 500 | $60.00 | $30,000.00 |
| | 12/10/2015 | S | 533 | $63.90 | $34,058.70 |
| | 12/10/2015 | S | 1,467 | $64.63 | $94,812.21 |
| | 12/10/2015 | S | 267 | $63.91 | $17,063.97 |
| | 12/10/2015 | S | 733 | $64.63 | $47,373.79 |
| | 1/11/2016 | S | 999 | $65.45 | $65,384.55 |
| | 1/11/2016 | S | 1,001 | $66.33 | $66,396.33 |
| | 1/11/2016 | S | 501 | $65.45 | $32,790.45 |
| | 1/11/2016 | S | 499 | $65.33 | $32,599.67 |
| | | **Total** | **12,000** | **Total** | **$740,514.67** |
| | | | | | |
| **SBLENDORIO Current Chief Executive Officer & Director** | 7/16/2015 | S | 1,000 | $62.00 | $62,000.00 |
| | 7/17/2015 | S | 2,000 | $70.00 | $140,000.00 |
| | 12/30/2015 | S | 2,000 | $80.00 | $160,000.00 |
| | 6/2/2016 | S | 671 | $57.20 | $38,381.20 |
| | | **Total** | **5,671** | **Total Proceeds** | **$400,381.20** |
| | | | | | |
| **Defendant Dyrberg through NOVO A/S** | 3/5/2015 | S | 1,005,000 | $51.75 | $52,008,750.00 |
| | 5/24/2016 | S | 1,300,000 | $49.00 | $63,700,000.00 |
| | | **Total** | **2,305,000** | **Total** | **$115,708,750.00** |
| | | | | | |
| | | | | | |
| | | **Total** | **3,305,877** | **Total Proceeds** | **$162,329,184.05** |

## DAMAGES TO OPHTHOTECH

94.     As a result of the Individual Defendants' improprieties, Ophthotech disseminated improper, public statements concerning the Company's Phase 2b trial results and Phase 3 trial criteria.   These improper statements have devastated Ophthotech's credibility as reflected by Ophthotech's almost $2.5 billion, or 93%, market capitalization loss.

95.     Ophthotech's performance issues also damaged its reputation within the business community and in the capital markets.   The Company has no product for sale and no revenue, it is highly dependent on raising money through capital markets and partnering with larger drug companies.   These drug companies are less likely to partner with companies that are not trustworthy and cannot properly conduct development trials.   In fact, following the failure of the Fovista Phase 3 trial, Novartis canceled the Novartis Agreement with the Company, which called for Novartis to pay Ophthotech hundreds of millions of dollars based on the Company achieving certain milestones.

96.     In addition, Ophthotech's ability to raise equity capital or debt on favorable terms in the future is now impaired due to its lack of trustworthiness and devastating stock price crash. As a result, Ophthotech stands to incur higher marginal costs of capital and debt because the improper statements disseminated by the Individual Defendants have materially increased the perceived risks of investing in and lending money to Ophthotech.

97.     Further, as a direct and proximate result of the Individual Defendants' actions, Ophthotech has expended, and will continue to expend, significant sums of money.   Such expenditures include, but are not limited to:

(a)     costs incurred from defending and paying any settlement in the class actions for violations of federal securities laws;

(b)     costs incurred from conducting a Phase 3 trial based on the results of the flawed Phase 2b trial; and

(c)     costs incurred from compensation and benefits paid to the defendants who have breached their duties to Ophthotech.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

98.     Plaintiff brings this action derivatively in the right and for the benefit of Ophthotech to redress injuries suffered, and to be suffered, by Ophthotech as a direct result of breaches of fiduciary duty, waste of corporate assets, and unjust enrichment, as well as the aiding and abetting thereof, by the Individual Defendants.  Ophthotech is named as a nominal defendant solely in a derivative capacity.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

99.     Plaintiff will adequately and fairly represent the interests of Ophthotech in enforcing and prosecuting its rights.

100.     Plaintiff was a stockholder of Ophthotech at the time of the wrongdoing complained of, has continuously been a stockholder since that time, and is a current Ophthotech stockholder.

101.     The current Board of Ophthotech consists of the following seven individuals: defendants Bolte, Dyrberg, Guyer, Redlick, Ross, and Sblendorio and nondefendant Jane Pritchett Henderson.  Plaintiff has not made any demand on the present Board to institute this action because such a demand would be a futile, wasteful, and useless act, as set forth below.

**Demand Is Excused Because Defendants Bolte, Dyrberg, Guyer, Redlick, Ross, and Sblendorio Face a Substantial Likelihood of Liability for Their Misconduct**

102.     As detailed above, defendants Bolte, Dyrberg, Guyer, Redlick, Ross, and Sblendorio breached their fiduciary duties of loyalty by making improper statements in

Ophthotech's press releases and SEC filings. Fovista was the Company's primary product candidate. As such, these defendants, constituting a majority of the Board, knew or recklessly disregarded that Ophthotech's press releases and other public statements were improper because they contained misleading statements as to the clinical trials of Fovista, the most important event in the Company's history.

103.    Defendants Guyer, Sblendorio, and Dyrberg (through Novo A/S) sold Ophthotech stock under highly suspicious circumstances. These defendants, as directors and officers of the Company, possessed material, nonpublic Company information and used that information to benefit themselves and their companies. Accordingly, defendants Guyer, Sblendorio, and Dyrberg face a substantial likelihood of liability for breach of their fiduciary duty of loyalty, rendering any demand upon them futile.

104.    Defendants Bolte and Redlick, as members of the Audit Committee, reviewed and approved the improper statements and earnings guidance. The Audit Committee's Charter provides that the Audit Committee coordinate the oversight of the Company's internal controls, including controls over financial reporting and disclosures. The Audit Committee was also tasked with working on the Company's risk management and risk assessment. The key risk facing the Company, and the key item the public was concerned about, was FDA approval of Fovista, and therefore, the results of the Phase 2 and Phase 3 testing. Thus, the Audit Committee Defendants were obligated to know the deficiencies in the Phase 2b testing results and the differences in the Phase 2b and Phase 3 trials. Nevertheless, and despite their obligations concerning reporting and disclosures, the Audit Committee Defendants caused these improper statements. Accordingly, the Audit Committee Defendants breached their fiduciary duty of loyalty and good faith because they participated in the wrongdoing described herein. Thus,

defendants Bolte and Redlick face a substantial likelihood of liability for their breach of fiduciary duties so any demand upon them is futile.

**Demand Is Excused Because the Board Lacks Independence**

105.    Defendant Guyer is, the cofounder and Executive Chairman of the Board, is a venture partner at SV Health Investors ("SV Health") and has been employed by SV Health since 2006.  Defendant Ross is presently the managing partner at SV Health and has been employed there since 2001.

106.    Defendant Galakatos is the cofounder and managing director of Clarus Ventures ("Clarus").

107.    Defendant Bolte has been employed by HBM Partners AG ("HBM") since 2003, was an investment advisor at HBM from 2003 to 2017, and is currently a venture partner at HBM.

108.    As previously noted, defendant Dyrberg is the managing partner at Novo Ventures.  He was a senior partner at Novo Ventures from at least October 2011 to 2015. Defendant Dyrberg was also the former CEO of Novo A/S.

109.    Clarus, SV Health, HBM, and Novo (Novo A/S and Novo Ventures) consistently invest in the same companies together.  These venture capital funds then return to the same cast of individuals to serve as directors—defendants Galakatos, Guyer, Ross, Bolte, Sblendorio, and Dyrberg.  The following table shows the overlapping investments among these firms, in addition to Ophthotech (which they all invested in):

| Venture Capital Firm | Achillion Pharmaceuticals, Inc. | Allocure, Inc. | AnaptysBio, Inc. | Avrobio, Inc. | Catabasis Pharmaceuticals, Inc. | Delenex Therapeutics AG | ESBATech AG | Imagen Biotech, Inc. | Karus Therapeutics Limited | Link Medicine Corporation |
|---|---|---|---|---|---|---|---|---|---|---|
| Clarus Ventures | X | - | - | X | X | X | X | - | - | X |
| HBM Partners AG | - | - | X | - | - | X | X | - | - | - |
| SV Health Investors | X | X | - | X | X | X | X | X | X | X |
| Novo A/S (including Novo Ventures) | - | X | X | - | - | X | - | X | X | - |

| Venture Capital Firm | Lux Biosciences, Inc. | Micromet, Inc. | Mpex Pharmaceuticals, Inc. | Neomend, Inc. | Nuvelution Pharma, Inc. | ObsEva SA | PanOptica, Inc. | PTC Therapeutics, Inc. | Vantia Ltd | ZS Pharma, Inc. |
|---|---|---|---|---|---|---|---|---|---|---|
| Clarus Ventures | - | - | - | X | X | - | - | - | - | - |
| HBM Partners AG | X | X | X | - | - | X | - | X | - | X |
| SV Health Investors | X | X | X | - | - | - | X | - | X | - |
| Novo A/S (including Novo Ventures) | X | - | - | X | X | X | X | X | X | X |

** "X" Indicates that the subject venture capital firm invested in the company.

110.  SV Health invested in Eyetech, a company founded by defendants Guyer and Patel.  Further, defendant Sblendorio served as the CFO of Eyetech.  MPM Capital Advisors ("MPM") also invested in Eyetech.  Defendant Galakatos was a general partner of MPM and defendant Sblendorio was the CEO, CFO, and managing director.

111.  SV Health, HBM, and Novo A/S all invested in Lux Biosciences.  Defendants Bolte, Guyer, and Dyrberg all served as directors of Lux Biosciences.

112.  SV Health and Novo Ventures both invested in PanOptica.  Defendant Guyer cofounded PanOptica and is currently a director.  Defendant Dyrberg was also a director of PanOptica.

113.  SV Health and Novo Ventures also both invested in Imagen Biotech.  Defendant Guyer was also a cofounder of Imagen Biotech.

114.  SV Health and Clarus both invested in Catabasis Pharmaceuticals.  Defendant Ross has been a director and Chairman of the board of directors of Catabasis Pharmaceuticals since 2010.

115.  SV Health and Clarus also both invested in Link Medicine Corporation. Defendant Guyer has been a director of Link Medicine Corporation since 2013.

116.    SV Health and Novo invested in AlloCure, Inc.  Defendants Dyrberg and Guyer were directors of AlloCure, Inc.

117.    Clarus also invested in Intercept Pharmaceuticals.   Defendant Sblendorio has served as a director of Intercept Pharmaceuticals since 2014.

118.    Accordingly, defendants Guyer, Ross, Bolte, and Dyrberg will not vote to initiate litigation against each other or defendant Galakatos due to the risk of their venture capital funds being cut out of future investment opportunities in retaliation.

119.    In addition, defendants Ross, Bolte, and Dyrberg will not vote to initiate litigation against either defendants Guyer or Patel.  Venture Capital firms have to compete in order to be allowed to invest into companies before they go public.  Defendants Ross, Bolte, and Dyrberg will not risk their and their firms' reputations and future investment opportunities by voting to initiate litigation against founders of a company.

120.    Defendant Redlick is a retired partner of Wilmer Hale Cutler Pickering Hale and Dorr LLP ("Wilmer Hale").  Defendant Redlick served in Wilmer Hale's Corporate Practice Group and served as co-chair of the firm's Life Sciences Group.  Defendant Redlick was the choice of counsel for defendants Galakatos, Guyer, Ross, and Bolte, their venture capital firms, and the firms' portfolio investments.   In particular, Wilmer Hale represented Ophthotech, Eyetech, PTC Therapeutics (a company in which defendant Bolte was a director at the time of the representation), Nabriva Therapeutics AG (defendant Bolte served as a director), Taligen Therapeutics (defendant Galakatos served as a director), The Medicines Company (defendant Sblendorio was a director and executive officer), MPM, and Clarus.  Defendant Redlick will not vote to initiate litigation against defendants Galakatos, Guyer, Ross, or Bolte due to the substantial work (and resulting fees) that he received from these individuals over the past twenty

years.

121.    The Board will not vote to initiate a lawsuit against defendant Dyrberg despite his substantial insider sales due to the Company's relationship with Novo A/S.  Defendant Dyrberg was CEO of Novo A/S and is now the managing partner of Novo Ventures, the life science venture capital investor arm of Novo A/S, which primarily invests in biotechnology and medical technology companies.  Novo A/S paid Ophthotech $125 million in royalty financing.  Given the Company's precarious position, the Board will not vote to initiate a lawsuit against one of the top executives at Novo Ventures and risk losing any future financing from Novo Ventures.

122.    The Board admits that defendants Sblendorio and Guyer, as employees of the Company, are not independent.  The principal professional occupation of defendant Sblendorio in particular is his employment with Ophthotech, pursuant to which he has received and continues to receive substantial monetary compensation and other benefits as alleged above. Accordingly, defendant Sblendorio lacks independence from defendants Guyer, Bolte, Dyrberg, Redlick, and Ross due to his interest in maintaining his executive position at Ophthotech.  This lack of independence renders defendant Sblendorio incapable of impartially considering a demand to commence and vigorously prosecute this action.

123.    Plaintiff has not made any demand on the other stockholders of Ophthotech to institute this action since such demand would be a futile and useless act for at least the following reasons:

      (a)    Ophthotech is a publicly held company with over 36.1 million shares outstanding and thousands of stockholders as of July 31, 2018;

(b)     making demand on such a large number of stockholders would be impossible for plaintiff who has no way of finding out the names, addresses, or phone numbers of Company stockholders; and

(c)     making demand on all stockholders would force plaintiff to incur excessive expenses, assuming all stockholders could be individually identified.

## COUNT I

### Against the Individual Defendants for Breach of Fiduciary Duty

124.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

125.    The Individual Defendants owed and owe Ophthotech fiduciary obligations.  By reason of their fiduciary relationships, the Individual Defendants owed and owe Ophthotech the highest obligation of good faith, fair dealing, loyalty, and due care.

126.    The Individual Defendants and each of them, violated and breached their fiduciary duties of candor, good faith, and loyalty.  More specifically, the Individual Defendants violated their duty of good faith by creating a culture of lawlessness within Ophthotech, and/or consciously failing to prevent Ophthotech from engaging in the unlawful acts complained of herein.

127.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Ophthotech has sustained significant damages, as alleged herein.  As a result of the misconduct alleged herein, these defendants are liable to Ophthotech.

128.    Plaintiff, on behalf of Ophthotech, has no adequate remedy at law.

## COUNT II

### Against the Individual Defendants for Waste of Corporate Assets

129.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

130.    As a result of the wrongdoing and by failing to conduct proper supervision, the Individual Defendants have caused Ophthotech to waste its assets by running fundamentally flawed clinical trials for Fovista, paying improper compensation, and bonuses to certain of its executive officers and directors that breached their fiduciary duty.

131.    As a result of the waste of corporate assets, the Individual Defendants are liable to Ophthotech.

132.    Plaintiff, on behalf of Ophthotech, has no adequate remedy at law.

## COUNT III

### Against the Individual Defendants for Unjust Enrichment

133.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

134.    By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of Ophthotech.  The Individual Defendants were unjustly enriched as a result of the improper sales, compensation, and director remuneration they received while breaching fiduciary duties owed to Ophthotech.

135.    Plaintiff, as a stockholder and representative of Ophthotech, seeks restitution from these defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits, and other compensation obtained by these defendants, and each of them, from their wrongful conduct and fiduciary breaches.

136.    Plaintiff, on behalf of Ophthotech, has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff, on behalf of Ophthotech, demands judgment as follows:

A.    Against all of the defendants and in favor of Ophthotech for the amount of damages sustained by Ophthotech as a result of the defendants' breaches of fiduciary duties, waste of corporate assets, and unjust enrichment;

B.    Directing Ophthotech to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Ophthotech and its stockholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for stockholder vote, resolutions for amendments to Ophthotech's Bylaws or Articles of Incorporation and taking such other action as may be necessary to place before stockholders for a vote of the following corporate governance policies:

1.    a proposal to strengthen the Company's controls over clinical testing, including, trial design;

2.    a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater stockholder input into the policies and guidelines of the Board;

3.    a provision to permit the stockholders of Ophthotech to nominate at least three candidates for election to the Board;

4.    a provision to control insider selling; and

5.    a proposal to strengthen Ophthotech's oversight of its disclosure procedures;

C.      Extraordinary equitable and/or injunctive relief as permitted by law, equity, and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on, or otherwise restricting the proceeds of defendants' trading activities or their other assets so as to assure that plaintiff on behalf of Ophthotech has an effective remedy;

D.      Awarding to Ophthotech restitution from defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation obtained by the defendants, including all ill-gotten gains from insider selling by defendants;

E.      Awarding to plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

F.      Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated: August 31, 2018                           LAW OFFICES OF THOMAS G. AMON

                                                  /s/*Thomas G. Amon*
                                                 THOMAS G. AMON

                                                 733 3rd Avenue, 15th Floor
                                                 New York, NY 10017
                                                 Telephone: (212) 810-2430
                                                 E-mail: tamon@amonlaw.com

                                                 ROBBINS ARROYO LLP
                                                 BRIAN J. ROBBINS
                                                 CRAIG W. SMITH
                                                 SHANE P. SANDERS
                                                 600 B Street, Suite 1900
                                                 San Diego, CA 92101
                                                 Telephone: (619) 525-3990
                                                 Facsimile: (619) 525-3991
                                                 E-mail: brobbins@robbinsarroyo.com
                                                         csmith@robbinsarroyo.com
                                                         ssanders@robbinsarroyo.com

                                                 Attorneys for Plaintiff

1285399

## VERIFICATION

I, Luis Pacheco, hereby declare as follows:

I am the plaintiff in the within entitled action.  I have read the Verified Stockholder Derivative Complaint for Breach of Fiduciary Duty, Waste of Corporate Assets, and Unjust Enrichment.  Based upon discussions with and reliance upon my counsel, and as to those facts of which I have personal knowledge, the Complaint is true and correct to the best of my knowledge, information, and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Signed and Accepted:

Dated: ___8/24/2018___

_____
LUIS PACHECO