UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------X
                        :

LUIS PACHECO, Derivatively on Behalf of    :
Ophthotech Corporation,                 :
                        :

                Plaintiff,   :

                        :
        - against -        :
                        :

DAVID R. GUYER, GLENN P.        :
SBLENDORIO, DAVID E. REDLICK,   :
THOMAS DYRBERG, AXEL BOLTE,   :
MICHAEL J. ROSS, SAMIR C. PATEL, and :
NICHOLAS GALAKATOS,       :
                        :

              Defendants.   :
                        :

------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: __9/19/2019__

No. 18-cv-7999 (VSB)

**OPINION & ORDER**

Appearances:

Thomas G. Amon
Law Office of Thomas G. Amon
New York, New York
*Counsel for Plaintiff*

Jeremy Todd Adler (New York, New York)
Michael G. Bongiorno (New York, New York)
Timothy J. Perla (Boston, Massachusetts)
Wilmer Cutler Pickering Hale & Dorr LLP
*Counsel for Defendants*

VERNON S. BRODERICK, United States District Judge:

      Shareholder plaintiff Luis Pacheco, derivatively on behalf of Ophthotech Corporation,

brings this action against eight current and former Ophthotech directors and officers for breach

of fiduciary duty, unjust enrichment, and waste of corporate assets. Before me is Defendants'

motion to dismiss the derivative complaint based upon Plaintiff's failure to make a demand on

Ophthotech's Board of Directors (the "Board") before filing suit. Because I find that Plaintiff

has alleged particularized facts demonstrating that demand would have been futile, Defendants' motion to dismiss is DENIED.

## I.   __Background__[1]

### A. *The Parties*

Ophthotech is a biopharmaceutical company incorporated under Delaware law, which has its "principal executive offices [] at One Penn Plaza, 35th Floor, New York, New York." (Compl. ¶¶ 2, 15.) Plaintiff Luis Pacheco, a Florida resident, was an Ophthotech stockholder during the period of the wrongdoing complained of (March 2, 2015 through December 12, 2016 (the "Relevant Period")), and has continued to hold Ophthotech stock as of the filing of the Complaint. (*Id.* ¶ 14.)

Defendants are six current members of the Ophthotech Board of Directors[2] ("Ophthotech Board" or "Board") and two former members of the Board.[3] (*Id.* ¶¶ 16–23.) At the time the Complaint was filed in August 2018, Ophthotech's Board was comprised of seven directors—Defendants Guyer, Sblendorio, Redlick, Dyrberg, Bolte, and Ross, as well as Jane Pritchett Henderson, the only director not named as a defendant in this action. (*Id.* ¶ 101.) Defendant David R. Guyer co-founded Ophthotech in 2007 and served as Chief Executive Officer ("CEO") and Chairman of the Board until July 2017; since July 2017, he has served as Executive Chairman. (*Id.* ¶ 16.) Defendant Guyer is also a defendant in a related consolidated securities

---

[1] The following factual summary is drawn from the allegations contained in the Verified Stockholder Derivative Complaint for Breach of Fiduciary Duty, Waste of Corporate Assets, and Unjust Enrichment, ("Complaint" or "Compl."), filed August 31, 2018. (Doc. 1.) I assume the allegations set forth in the Complaint to be true for purposes of this motion. *See Kassner v. 2nd Ave. Delicatessen Inc.*, 496 F.3d 229, 237 (2d Cir. 2007). My references to these allegations should not be construed as a finding as to their veracity, and I make no such findings.

[2] The six Board members are David R. Guyer, Glenn P. Sblendorio, David E. Redick, Thomas Dyrberg, Axel Bolte, and Michael J. Ross.

[3] The former Board members are Samir C. Patel and Nicholas Galakatos.

class action (*Micholle v. Ophthotech Corp.*, No. 17-cv-210 (S.D.N.Y.) (the "Securities Action")), which alleges violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b), 78t(a). Defendant Samir C. Patel co-founded Ophthotech along with Guyer and served as President and Vice Chairman of the Board until January 2017; since January 2017, Patel has acted as a consultant to Ophthotech. (*Id.* ¶ 22.) Patel is also a defendant in the Securities Action. (*Id.*) Defendant Glenn P. Sblendorio has served as President and CEO of Ophthotech since 2017, and has served as a director since May 2017. (*Id.* ¶ 17.) Defendant Nicholas Galakatos was an Ophthotech director from December 2009 to May 2016. (*Id.* ¶ 23.) David E. Redick, Thomas Dyrberg, Axel Bolte, and Michael J. Ross were outside directors at Ophthotech during the Relevant Period. (*Id.* ¶¶ 18–21.)

## B. *Factual Allegations*

This lawsuit arises from statements made and actions taken by Defendants in conjunction with clinical trials for Fovista, a new drug developed by Ophthotech to treat macular degeneration. Many of the allegations in the Complaint are taken from the facts set forth in the Consolidated Amended Complaint for Violations of the Federal Securities Laws (the "Consolidated Complaint") in the related Securities Action. *See Micholle*, No. 17-cv-210, ECF No. 63. On September 17, 2019, I issued an Opinion & Order denying a motion to dismiss the Consolidated Complaint in the Securities Action. *See id.*, ECF No. 89 ("Securities O&O"). In the Securities O&O, I summarized in detail the allegations set forth in the Consolidated Complaint. (*See* Securities O&O, Part I.) I assume familiarity with that opinion and recite here only those facts necessary to decide this motion.[4]

---

[4] In the Securities O&O, I found that certain of challenged statements—i.e., those statements characterizing the successful results of the Fovista Phase 2b clinical trial—were not materially false or misleading. *See* Securities O&O, Part IV.A.2.a. Because I have already determined the insufficiency of the allegations relating to those statements, I will not summarize those statements again here.

### 1. The Fovista Clinical Trials

During the Relevant Period, Ophthotech was focused on developing the drug Fovista for the treatment of wet age-related macular degeneration ("wet AMD"). (Compl. ¶ 39.) "Wet AMD" is a degenerative eye disease that occurs when areas of abnormal blood vessels and abnormal tissue—commonly referred to as "lesions"—form in the retina and leak fluid or blood, causing patients to experience blurred vision and blind spots in their visual field. (*Id.* ¶¶ 39, 44.) Ophthotech designed Fovista to be used in combination with anti-vascular endothelial growth factor ("anti-VEGF") drugs, which are commonly used to treat wet AMD. (*Id.* ¶ 40.) Anti-VEGF agents—including the drug Lucentis—block proteins that bind to cells on the inner lining of the abnormal blood vessels associated with wet AMD, thereby inhibiting cell growth; Fovista, by contrast, is an anti-platelet derived growth factor ("anti-PDGF") agent designed to block proteins that bind to cells on the outer lining of the abnormal blood vessels. (*Id.* ¶¶ 40, 43.)

In order to secure approval from the United States Food and Drug Administration, a new drug must typically undergo three phases of clinical trials. (*Id.* ¶¶ 41–42.) Phase 1 involves the introduction of the drug to a small group of patients with the target disease. (*Id.* ¶ 42.) Phase 2 evaluates the safety and efficacy of the drug on a larger group of patients, while Phase 3 expands the safety and efficacy assessment to even more patients. (*Id.*)

In June 2012, Ophthotech completed a Phase 2b clinical trial of Fovista (the "Phase 2b Trial"), which measured improvements in visual acuity for wet AMD patients receiving Fovista administered in combination with Lucentis ("Fovista combination therapy"), as compared to improvements when patients received Lucentis alone ("Lucentis monotherapy"). (*Id.* ¶ 43.) In selecting individuals to participate in the Phase 2b Trial, Ophthotech analyzed wet AMD patients' lesions and divided patients into subgroups on the basis of whether their lesions

contained "classic" or "occult" components. (*Id.* ¶ 45.) Patients whose lesions were classified as "pure occult"—meaning they contained no classic components—were not eligible to participate in the Phase 2b Trial. (*Id.*) A press release announcing the results of the Phase 2b Trial stated that those patients receiving Fovista combination therapy saw a 62% greater improvement in visual acuity over those patients receiving Lucentis monotherapy. (*Id.* ¶ 49.) Following the success of the Phase 2b Trial, Ophthotech completed its initial public offering on September 30, 2013, raising hundreds of millions of dollars to finance the third phase of the Fovista clinical trials (the "Phase 3 Trial"). (*Id.* ¶ 46.)

Ophthotech launched the Phase 3 Trial in August 2013. (*Id.* ¶ 47.) Ophthotech determined which patients were eligible to participate in the Phase 3 Trial based not on the classification of wet AMD lesions as "classic" or "occult" (excluding all patients with "pure occult" lesions), but rather, based on the presence of subretinal hyper-reflective material ("SHRM"). (*Id.* ¶ 45.) This change in the eligibility criteria was the result of Ophthotech's adoption of new retinal imaging technology, spectral domain optical coherence tomography ("SD-OCT"). (*Id.* ¶ 69.) SHRM is a newly discovered type of abnormal tissue, which may be found in patients whose lesions are classified as either classic or occult. (*Id.* ¶ 45.) Despite this modification of the methodology used to determine a patient's eligibility to participate in the Phase 3 Trial, Ophthotech's 2014 Form 10-K[5]—filed with the U.S. Securities and Exchange Commission ("SEC") on March 2, 2015—represented that Ophthotech "ha[d] made no meaningful changes to the inclusion and exclusion criteria in these Phase 3 clinical trials from those [it] used in [its] Phase 2b clinical trial," and further stated that Defendants "expect[ed] that

---

[5] Defendants Guyer, Patel, Bolte, Dyrberg, Galakatos, Ross, and Sblendorio signed Ophthotech's 2014 Form 10-K. (Compl. ¶ 49.)

this w[ould] result in the enrollment of a patient population similar to the patient population enrolled in [its] Phase 2b clinical trial." (*Id.* ¶ 50.) During the Phase 3 Trial, Ophthotech directors and officers—including, specifically, Defendants Guyer and Patel—made numerous statements in SEC filings, press releases, and at conferences asserting that Ophthotech had not materially changed the enrollment criteria between Phase 2b and Phase 3 of the Fovista clinical trials. (*Id.* ¶¶ 48–79.)

On December 12, 2016, Ophthotech announced the results of the Phase 3 Trial, and informed investors that "[n]o benefit [was] observed" in those patients receiving Fovista combination therapy over those control group patients receiving Lucentis monotherapy. (*Id.* ¶ 80.) Ophthotech's market capitalization promptly plummeted approximately 86%, from a value of almost $1.4 billion on Friday, December 9, 2016 to less than $200 million on Monday, December 12, 2016. (*Id.* ¶ 81.) As of the date of the filing of the Complaint, Ophthotech's market capitalization was approximately $87.6 million, with its common stock trading below $3.00 per share. (*Id.*)

## 2. Defendants' Stock Sales and Ongoing Business Relationships

During the Relevant Period, Defendants Guyer, Patel, Sblendorio, Galakatos, and Dyrberg sold a substantial number of their shares of Ophthotech common stock. Guyer sold nearly all of his Ophthotech stock for proceeds of more than $22.6 million, (Compl. ¶ 89), while Patel sold more than 76% of his personally held stock for almost $22.9 million, (*id.* ¶ 88). Sblendorio and Galakatos sold approximately 84% and 44%, respectively, of their Ophthotech holdings as well. (*Id.* ¶¶ 90–91.) Finally, the asset management company Novo A/S—which employed Defendant Dyrberg as CEO—sold approximately 39% of its Ophthotech holdings during the Relevant Period, generating proceeds of $115.7 million. (*Id.* ¶¶ 19, 92.) In total,

these five Defendants, either individually or through corporate entities which they oversaw, sold more than $162 million worth of Ophthotech stock between March 2015 and December 2016. (*Id.* ¶ 93.)

In addition to their roles as Ophthotech officers and directors, Defendants were also involved in numerous other joint business ventures and have made many of the same investments. Defendants Guyer, Ross, Galakatos, Bolte, and Dyrberg are partners of venture capital ("VC") firms, which routinely invest in biotechnology companies together. (*Id.* ¶¶ 105–09.) Specifically, both Guyer and Ross are partners of the VC firm SV Health Investors ("SV Health"), where Guyer serves as venture partner and Ross serves as the managing partner. (*Id.* ¶ 105.) Guyer and Ross have been associated with SV Health since 2006 and 2001, respectively. (*Id.*) Galakatos is co-founder and managing director of Clarus Ventures ("Clarus"), another VC firm. (*Id.* ¶ 106.) Bolte is a venture partner at HBM Partners AG ("HBM") and has been employed there since 2003, (*id.* ¶ 107), and Dyrberg was CEO of Novo A/S and then managing partner of related VC firm Novo Ventures (collectively, "Novo"), (*id.* ¶¶ 92, 108). Defendants have made overlapping investments in more than 20 companies, on whose boards many of them also sit. (*Id.* ¶¶ 109–17.) These investments include:

- ***Eyetech Pharmaceuticals, Inc.***: Both SV Health (Guyer/Ross) and Galakatos invested in Eyetech, which was founded by Guyer and Patel. (*Id.* ¶¶ 37 n.2, 110.) Sblendorio served as Eyetech's Chief Financial Officer. (*Id.*)

- ***Lux Biosciences, Inc.***: SV Health (Guyer/Ross), HBM (Bolte), and Novo (Dyrberg) all invested in Lux Biosciences, and Guyer, Bolte, and Dyrberg have all served on the company's board. (*Id.* ¶ 111.)

- ***PanOptica, Inc.* and *AlloCure, Inc***.: SV Health (Guyer/Ross) and Novo (Dyrberg) both invested in both of these companies, and Guyer and Dyrberg are current or former directors of both companies. (*Id.* ¶¶ 112, 116.) Guyer co-founded PanOptica. (*Id.* ¶ 112.)

- ***Imagen Biotech, Inc.***:  SV Health (Guyer/Ross) and Novo (Dyrberg) invested in Imagen, which Guyer also co-founded.  (*Id.* ¶ 113.)

- ***Catabasis Pharmaceuticals, Inc.***:  SV Health (Guyer/Ross) and Clarus (Galakatos) both invested in Catabasis, and Ross has been Chairman of Catabasis's board of directors since 2010.  (*Id.* ¶ 114.)

- Finally, all four of Defendants' VC firms—SV Health, Clarus, HBM and Novo— invested in Delenex Therapeutics AG, as well as Ophthotech.  (*Id.* ¶ 109.)

## II.    Procedural History

On January 11, 2017, Frank Micholle filed the Securities Action, alleging that Ophthotech and several of its officers and directors violated Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b), 78t(a), as well as SEC Rule 10b–5, by making materially false and misleading statements regarding the parameters and results of the Fovista clinical trials. *Micholle*, No. 17-cv-210, ECF No. 1.[6]  The Consolidated Complaint was filed on June 4, 2018, naming only Ophthotech, Guyer, and Patel as defendants.  *Id.*, ECF No. 63.  In an Opinion & Order dated September 17, 2019, I denied defendants' motion to dismiss the Consolidated Complaint in the Securities Action.  (*See* Securities O&O.)

Plaintiff filed this derivative action on August 31, 2018, asserting claims for breach of fiduciary duty, waste of corporate assets, and unjust enrichment on Ophthotech's behalf against eight current and former Ophthotech officers and directors.  (Doc. 1.)  Plaintiff did not make a litigation demand on the Ophthotech Board of Directors before filing suit.  (Compl. ¶ 101.)  On December 14, 2018, Defendants filed a motion to dismiss the Complaint for failure to make a demand on the Board, (Doc. 32), along with a memorandum of law and supporting declaration, (Docs. 33–34).  Plaintiff filed his opposition to the motion to dismiss on February 22, 2019,

---

[6] I subsequently appointed the Sheet Metal Workers' Pension Plan of Southern California, Arizona, and Nevada as lead plaintiff in the Securities Action.  *See Micholle*, No. 17-cv-210, ECF No. 56.

(Doc. 40), and Defendants submitted a reply in further support of their motion on April 3, 2019, (Doc. 41).

## III. <u>Legal Standard</u>

### A. *Motion to Dismiss*

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim will have "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* This standard demands "more than a sheer possibility that a defendant has acted unlawfully." *Id.* "Plausibility . . . depends on a host of considerations: the full factual picture presented by the complaint, the particular cause of action and its elements, and the existence of alternative explanations so obvious that they render plaintiff's inferences unreasonable." *L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 430 (2d Cir. 2011).

In considering a motion to dismiss, a court must accept as true all well-pleaded facts alleged in the complaint and must draw all reasonable inferences in the plaintiff's favor. *Kassner v. 2nd Ave. Delicatessen Inc.*, 496 F.3d 229, 237 (2d Cir. 2007). A complaint need not make "detailed factual allegations," but it must contain more than mere "labels and conclusions" or "a formulaic recitation of the elements of a cause of action." *Iqbal*, 556 U.S. at 678 (internal quotation marks omitted). Although all allegations contained in the complaint are assumed to be true, this tenet is "inapplicable to legal conclusions." *Id.* On a motion to dismiss, a court may consider "any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed

with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007).

## B. *Demand Futility*

"The derivative form of action permits an individual shareholder to bring suit to enforce a corporate cause of action against officers, directors, and third parties." *Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 95 (1991) (emphasis omitted) (internal quotation marks omitted). Because the determination as to whether to pursue a lawsuit on behalf of a corporation is generally "within the power and responsibility of the board of directors," *In re Citigroup. Inc. S'holder Deriv. Litig.*, 964 A.2d 106, 120 (Del. Ch. 2009) (citing 8 Del. C. § 141(a)), Federal Rule of Civil Procedure 23.1 requires that the complaint in a derivative action "state with particularity [] any effort by the plaintiff to obtain the desired action from the directors" or "the reasons for . . . not making the effort." Fed. R. Civ. P. 23.1(3); *see also Rales v. Blasband,* 634 A.2d 927, 932 (Del. 1993) ("Because directors are empowered to manage . . . the business and affairs of the corporation, the right of a stockholder to prosecute a derivative suit is limited to situations where the stockholder has demanded that the directors pursue the corporate claim and they have wrongfully refused to do so or where demand is excused because the directors are incapable of making an impartial decision regarding such litigation."). Where a plaintiff has not made a pre-suit demand, "the complaint must plead with particularity facts showing that a demand on the board would have been futile." *In re Citigroup*, 964 A.2d at 120.

"The substantive law which determines whether demand is, in fact, futile is provided by the state of incorporation of the entity on whose behalf the plaintiff is seeking relief." *Scalisi v. Fund Asset Mgmt., L.P.*, 380 F.3d 133, 138 (2d Cir. 2004). Because Ophthotech is a Delaware corporation, (Compl. ¶ 15), Delaware law governs whether Plaintiff may pursue his claims

despite his failure to make a demand on the Ophthotech Board.  To establish demand futility

under Delaware law, a plaintiff must allege specific facts that "create a reasonable doubt that, as

of the time the complaint [wa]s filed, the board of directors could have properly exercised its

independent and disinterested business judgment in responding to a demand." *Rales*, 634 A.2d

at 934.  "Such reasonable doubt must be raised as to a majority of the board of directors sitting at

the time the complaint [wa]s filed." *In re Morgan Stanley Derivative Litig.*, 542 F. Supp. 2d

317, 322 (S.D.N.Y. 2008); *see also In re Ezcorp Inc. Consulting Agreement Derivative Litig.*,

No. 9962-VCL, 2016 WL 301245, at *34 (Del. Ch. Jan. 25, 2016) ("If the board of directors

lacks a majority comprising independent and disinterested directors, then demand is futile."),

*reconsidered in part on other grounds*, 2016 WL 727771 (Del. Ch. Feb. 23, 2016).  "A director

will be considered unable to act objectively with respect to a presuit demand if he or she is

interested in the outcome of the litigation or is otherwise not independent." *Beam ex rel. Martha

Stewart Living Omnimedia, Inc. v. Stewar*t, 845 A.2d 1040, 1049 (Del. 2004).

### IV.    Discussion

In order to determine whether Plaintiff has demonstrated that it would have been futile to

make a litigation demand on the Ophthotech Board, I must evaluate whether the Complaint

alleges with particularity facts suggesting that at least four of the seven directors on the Board at

the time Plaintiff filed suit would have been incapable of impartially considering such a demand.

I therefore must first analyze whether the misconduct alleged in the Complaint renders any of the

directors "interested" in the outcome of the litigation, and, if so, whether any of the other

directors are compromised in their ability to act independently of the director(s) found to be

interested.  *See Guttman v. Huang*, 823 A.2d 492, 501–02 (Del. Ch. 2003).

For the reasons that follow, I find that Defendant Guyer—a named defendant in the

underlying Securities Action—is interested in the outcome of this litigation and that there is a reasonable doubt as to whether at least three of the other directors are capable of acting impartially with respect to Defendant Guyer. As a result, I conclude that Plaintiff did not need to make a demand on the Ophthotech Board.

### A. *Interestedness*

The Complaint alleges that six of the seven members of Ophthotech's Board—Defendants Guyer, Sblendorio, Redlick, Dyrberg, Bolte, and Ross—are interested in the outcome of this litigation because they face a substantial risk of liability for breaching their fiduciary duties by causing or allowing Ophthotech to make misleading statements regarding the Fovista clinical trials, and/or by selling their shares of Ophthotech stock based on material nonpublic information.

### 1. Applicable Law

The determination of whether a director is "interested" in the outcome of a lawsuit turns on whether that director "face[s] a 'substantial likelihood' of personal liability" for the misconduct alleged. *Guttman*, 823 A.2d at 501 (quoting *Rales*, 634 A.2d at 936). The "mere threat" of personal liability is insufficient. *Friedman v. Khosrowshahi*, No. 9161-CB, 2014 WL 3519188, at *10 (Del. Ch. July 16, 2014) (quoting *Aronson v. Lewis*, 473 A.2d 805, 815 (Del. 1984)). Courts assess interestedness on an individualized basis. *See In re INFOUSA, Inc. Shareholders Litig.*, 953 A.2d 963, 985 (Del. Ch. 2007) (emphasizing the need for a "fact-intensive, director-by-director analysis").

Where a company's certificate of incorporation contains an exculpatory provision, directors are shielded from claims for monetary damages, except for claims of breach of the duty of loyalty or bad faith. *See* Del. Code Ann. tit. 8§ 102(b)(7) ("A provision eliminating or

limiting the personal liability of a director . . . shall not eliminate or limit the liability of a director [] [f]or any breach of the director's duty of loyalty to the corporation or its stockholders; [or] for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law . . . ."); *cf. Morrone ex rel. Arotech Corp. v. Erlich*, No. 09 CV 1910 (RJD) (VVP), 2011 WL 1322085, at *4 (E.D.N.Y. Mar. 31, 2011). Although directors are entitled to a presumption that they were faithful in carrying out their fiduciary duties, *see Beam*, 845 A.2d at 1048, a plaintiff may plead a violation of the duty of loyalty by plausibly alleging a "conscious disregard for [the director's] responsibilities," *In re Walt Disney Co. Derivative Litig.*, 906 A.2d 27, 64 (Del. 2006).

## 2. Application

Ophthotech's Certificate of Incorporation exculpates directors to the fullest extent possible under Delaware law. (*See* Adler Decl. Ex. 4, at 2 ("To the fullest extent permitted by law, a director of the Corporation shall not be personally liable to the Corporation or its stockholders for monetary damages for breach of fiduciary duty as a director.").)[7] Notwithstanding this exculpatory provision, I find that Plaintiff has plausibly alleged facts creating a reasonable doubt as to Defendant Guyer's disinterestedness in this litigation.

Plaintiff asserts that Guyer, Sblendorio, Redlick, Dyrberg, Bolte, and Ross face a substantial likelihood of liability for breaching the duty of loyalty by causing Ophthotech to make false and misleading statements and/or by engaging in insider sales of Ophthotech stock. With respect to the making of materially misleading statements, I find Defendant Guyer to be in an entirely different position than the other directors. Guyer, unlike the other directors, (1) is named as a defendant in the Securities Action, (2) served as Ophthotech's CEO and Chairman of

---

[7] "Adler Decl." refers to the Declaration of Jeremy T. Adler, filed December 14, 2018. (Doc. 34.)

the Board during the Relevant Period, and (3) personally made many of the statements challenged by Plaintiff as materially false and misleading. *See Morrone*, 2011 WL 1322085, at *5 (finding that plaintiff's allegations that defendants made materially misleading statements excused demand with respect to those defendants who were also defendants in the corresponding securities action).

Defendants argue that the Complaint fails to plausibly allege that any of the challenged statements were false or misleading. (Defs.' Br. 12–13.)[8] However, I rejected this argument in the Securities O&O with respect to those statements denying material changes in the enrollment criteria between Phase 2b and Phase 3 of the Fovista clinical trial. (*See* Securities O&O, Part IV.A.2.b.) Moreover, Guyer personally made several of the statements identified in the Securities O&O as sufficiently misleading to withstand a motion to dismiss, including his comment at a November 17, 2015 conference that Ophthotech had "changed nothing" between Phase 2b and Phase 3, and his remark at a December 8, 2015 conference that the Phase 3 Trial was "really similar in virtually every way" to the Phase 2b Trial. (*See id.*) The Complaint here challenges these very same statements as materially misleading. (*See* Compl. ¶ 60 ("You see too many companies make a lot of changes from Phase 2 to Phase 3, and you get surprises. So we were just being superstitious and changed nothing."); *id.* ¶ 62 ("[T]he Phase [3] program really is to just confirm the Phase [2], really similar in virtually every way short of the regulatory time point of 12 months, which is needed for regulatory [approval], versus six months.").)

Defendants also contend that there are no allegations that Guyer—or any of the other directors—knew that any of their statements were false and misleading. However, Defendants'

---

[8] "Defs.' Br." refers to the Memorandum of Law in Support of Defendants' Motion to Dismiss the Verified Stockholder Derivative Complaint, filed December 14, 2018. (Doc. 33.)

argument focuses primarily on the purported lack of knowledge of those directors other than Guyer. (*See* Defs.' Br. 14–15 ("The Complaint is particularly deficient with respect to the outside Directors (Bolte, Dyrberg, Ross, and Redlick), and Mr. Sblendorio . . . .").) Defendants' failure to characterize the allegations against Guyer in a similar fashion speaks volumes. In concluding in the Securities O&O that the Consolidated Complaint identified strong circumstantial evidence of conscious misbehavior or recklessness on the part of Guyer and Patel, I found unpersuasive the argument that Defendant Guyer lacked knowledge that his statements were false and misleading. (*See* Securities O&O, Part IV.B.2.b.) I therefore conclude that the Complaint here, which contains similar allegations, sets forth facts sufficient to create a reasonable doubt that Guyer would have been capable of impartially responding to a litigation demand due to his own substantial risk of personal liability for the misconduct alleged.[9]

## B.    *Independence*

Having found that Defendant Guyer is interested in the outcome of this litigation, I next turn to the question of whether there is reasonable doubt as to the independence of the remaining Ophthotech directors vis-à-vis Guyer. So long as Plaintiff has adequately alleged facts that plausibly suggest that at least three other Ophthotech directors could not have acted impartially with respect to Guyer, demand futility will be established. Drawing all reasonable inferences in

---

[9] Because I have determined that Defendant Guyer faces a substantial likelihood of personal liability for breaching his fiduciary duties by making false and misleading statements in connection with the enrollment criteria for the Phase 3 Trial, I need not analyze Plaintiff's argument that Defendant Guyer also breached his fiduciary duties by selling a majority of his Ophthotech shares on the basis of material, nonpublic information. (*See* Pl.'s Opp'n 20–22.) ("Pl.'s Opp'n" refers to Plaintiff's Opposition to Defendants' Motion to Dismiss, filed February 22, 2019. (Doc. 40).) I note, however, that in the Securities O&O, I concluded that the plaintiff there had not established that Guyer's trades were unusual or suspicious in either timing or amount. (*See* Securities O&O, Part IV.B.2.a.)

In addition, because I conclude below that the Complaint adequately pleads that a majority of the other Ophthotech directors are not independent of Defendant Guyer for the purpose of impartially considering a litigation demand, *see infra* Part IV.B.2—and therefore that Plaintiff has satisfactorily alleged demand futility—I decline to assess whether any directors other than Guyer face a substantial likelihood of personal liability**.**

Plaintiff's favor—as I am bound to do at the motion to dismiss stage, *see Sandys v. Pincus*, 152 A.3d 124, 128 (Del. 2016)—I find that Plaintiff has carried his burden.

### 1. Applicable Law

In addition to alleging that a director faces a substantial likelihood of personal liability, a plaintiff may plead demand futility by demonstrating that there is reason to doubt the independence of a majority of the board's directors. *See Beam*, 845 A.2d at 1048–49. "Independence means that a director's decision is based on the corporate merits of the subject before the board rather than extraneous considerations or influences." *Aronson*, 473 A.2d at 816. The inquiry "turns on whether the plaintiffs have pled facts from which the director's ability to act impartially on a matter important to the interested party can be doubted because that director may feel either subject to the interested party's dominion or beholden to that interested party." *Sandys*, 152 A.3d at 128 (internal quotation marks omitted). "This doubt might arise either because of financial ties, familial affinity, a particularly close or intimate personal or business affinity or because of evidence that in the past the relationship caused the director to act non-independently vis à vis an interested director." *Beam*, 845 A.2d at 1051. Allegations of "mere personal friendship or outside business relationship," standing alone, are insufficient to "raise a reasonable doubt about a director's independence." *F5 Capital v. Pappas*, 856 F.3d 61, 84–85 (2d. Cir. 2017) (internal quotation marks omitted).

In evaluating a director's independence, "it is important that the trial court consider all particularized facts pled by the plaintiffs about the relationships between the director and the interested party in their totality and not in isolation from each other." *In re Ezcorp*, 2016 WL 301245, at \*34 (quoting *Del. Cty. Emps. Ret. Fund v. Sanchez*, 124 A.3d 1017, 1019 (Del. 2015)); *see also Del. Cty. Emps. Ret. Fund*, 124 A.3d at 1022 ("[O]ur law requires that all the

pled facts regarding a director's relationship to the interested party be considered in full context in making the, admittedly imprecise, pleading stage determination of independence."). In other words, a court must consider the totality of the facts and circumstances surrounding the relationship between the director and the interested party.

## 2. Application

The majority of Plaintiff's allegations undermining director independence focus on the "web of interlocking business relationships" among Defendants. (Pl.'s Opp'n 23.) Five of the Defendants—Guyer, Ross, Galakatos, Bolte, and Dyrberg (the "VC Defendants")[10]—are each partners and/or managing directors of four venture capital firms (Guyer and Ross are partners of the same VC firm, SV Health), and those firms routinely invest together in biotechnology companies on whose boards of directors the VC Defendants often serve together. Plaintiff has identified more than 20 companies in which two or more of the VC Defendants' venture capital firms have invested together. (Compl. ¶ 109.) In addition to acting as investors, Guyer, Ross, Bolte, and Dyrberg (as well as Defendant Sblendorio) serve as directors or officers of many of those 20 companies, (id. ¶¶ 110–17), and Guyer is the co-founder of at least three of them, in addition to Ophthotech (Eyetech, PanOptica, and Imagen Biotech), (id. ¶¶ 110, 112–13).[11] Based on these ongoing investment partnerships and professional ties, Plaintiff alleges that the VC Defendants "will not vote to initiate litigation against each other . . . due to the risk of their venture capital funds being cut out of future investment opportunities in retaliation." (Id. ¶ 118.)

---

[10] Because Defendant Galakatos was not a member of Ophthotech's Board when the Complaint was filed on August 31, 2018, (see Compl. ¶ 101), I do not specifically analyze Galakatos's ability to impartially evaluate a litigation demand implicating Defendant Guyer.

[11] In terms of each of Ross's, Dyrberg's, and Bolte's ongoing business ties with Guyer specifically, (1) Ross and Guyer are both partners of the VC firm SV Health and have both been employed by SV Health for more than a decade, (Compl. ¶ 105); (2) Dyrberg has invested in at least seven other companies together with SV Health, (id. ¶ 109); and (3) Bolte has invested with SV Health in at least five other companies, (id.).

It is well established that the mere allegation that a disinterested director has served on the boards of unaffiliated companies with an interested director is insufficient to render the disinterested director not independent. *See, e.g.*, *F5 Capital*, 856 F.3d at 84–85 (rejecting allegation that disinterested director was impartial on the ground that he sat on two boards with the interested director); *Highland Legacy Ltd. v. Singer*, No. CIV.A. 1566-N, 2006 WL 741939, at *5 (Del. Ch. Mar. 17, 2006) (dismissing plaintiff's allegations of a lack of independence as "based solely" on the fact that two disinterested directors had served with the interested director on the boards of two other companies). Here, however, Plaintiff has alleged a web of interrelated investments, overlapping financial interests, and business ties.

In analyzing whether Defendants Ross, Bolte, and Dyrberg are independent of Defendant Guyer, I find the 2016 Delaware Supreme Court decision in *Sandys v. Pincus*, 152 A.3d 124, particularly instructive. In *Sandys*, plaintiff alleged that two disinterested directors were not independent of the company's controlling director for pleading stage purposes on the ground that (1) both of the disinterested directors were partners at a VC firm that controlled approximately 10% of the company's equity; (2) that VC firm invested in another company co-founded by the controlling director's wife; and (3) the same VC firm and another interested director invested in yet another company, on whose board the interested director served. *Id.* at 131. Plaintiff alleged that these relationships indicated a "mutually beneficial network of ongoing business relations" between the disinterested directors and the interested directors, which the disinterested directors were "not likely to risk by causing [the company] to sue the [interested directors]." *Id.* The Delaware Supreme Court agreed, and reversed the Court of Chancery's dismissal of the complaint for failure to make a demand upon the company's board. *Id.* at 126. In so doing, the Delaware Supreme Court observed,

> [T]he reality is that firms like [the VC firm at issue] compete with others to finance talented entrepreneurs like [the controlling director], and networks arise of repeat players who cut each other into beneficial roles in various situations. There is, of course, nothing at all wrong with that. In fact, it is crucial to commerce and most human relations. But, precisely because of the importance of a mutually beneficial ongoing business relationship, it is reasonable to expect that sort of relationship might have a material effect on the parties' ability to act adversely toward each other. Causing a lawsuit to be brought against another person is no small matter, and is the sort of thing that might plausibly endanger a relationship.

*Id.* at 134.[12]  The ties between the VC Defendants here appear to be as strong as those between the *Sandys* defendants. Like the disinterested *Sandys* directors, both Guyer (who here is an interested director) and Ross are partners at the same venture capital firm, which has invested in not one or two but at least fifteen other companies—on many of whose boards other Ophthotech directors sit—in conjunction with overlapping combinations of Defendants Bolte, Dyrberg, and Galakatos. (Compl. ¶¶ 105, 109–10.) At least three of those other companies were founded by Defendant Guyer. (*See id.* ¶¶ 110, 112–13; *see also Sandys*, 152 A.3d at 126 (explaining that the "ongoing economic opportunities" generated by relationships between venture capitalists and entrepreneurs "can give rise to human motivations compromising the participants' ability to act impartially toward each other on a matter of material importance").)

Defendants correctly note that in *Sandys*, an additional factor—which is not present here—cut in favor of determining that a majority of the board lacked independence. There, the company's board had determined that the two disinterested directors did not qualify as independent under the NASDAQ listing rules. *See Sandys*, 152 A.3d at 126 (citing NASDAQ Marketplace Rule 5605(a)(2)). Although the *Sandys* court explained that the Delaware independence standard "is context specific and does not perfectly marry with the standards of the

---

[12] Importantly, the *Sandys* court concluded that the complaint satisfactorily pleaded demand futility notwithstanding the absence of allegations relating to "the size, profits, or materiality to [defendants] of [their overlapping] investments or interests." 152 A.3d at 135 (Valihura, J., dissenting).

stock exchange," the court acknowledged that it viewed the NASDAQ designation as relevant. *Id.* at 131–33. For this reason in particular, I find the question of the Ophthotech directors' independence to be a very close one. However, the *Sandys* court went on to consider *why* the board might have deemed the disinterested directors not independent under the NASDAQ rules, and that discussion focused exclusively on the ties among the venture capital firms and the entrepreneurs whose work they financed. *See id.* at 126, 134 (explaining that "venture capitalists compete to fund the best entrepreneurs and that these relationships can generate ongoing economic opportunities" such that it was "[p]erhaps for that reason" that the disinterested directors were classified as not independent under the stock exchange rules).[13]

Defendants here fail to even address the specifics of Plaintiff's allegations—i.e., the sheer number of the VC Defendants' overlapping investments, combined with the fact that the VC Defendants routinely sit on boards of companies financed by one another, (Compl. ¶¶ 109–17)— and instead rely on broad statements of law establishing that the "naked assertion of a previous business relationship is not enough to overcome the presumption of a director's independence." (Defs.' Br. 23 (quoting *Highland Legacy*, 2006 WL 741939, at *5).) In addition, Defendants fail to identify any legal authority casting doubt on *Sandys*'s assessment of the unique relationship between repeat players in the venture capital context and its relevance to pleading demand futility. Indeed, the relationships between Guyer, Ross, Bolte, Dyrberg, and Galakatos appear to epitomize the "networks . . . of repeat players who cut each other into beneficial roles in various

---

[13] Moreover, in opposing Plaintiff's unrelated contention that Guyer and Sblendorio automatically lack independence because they are Ophthotech employees, Defendants themselves argued against using stock exchange rules for determining whether a director is an 'independent director' for purposes of satisfying exchange rules, including NASDAQ Rule 5605(a)(2)." (*See* Defs.' Br. 23 n.15 ("The independence test for purposes of demand futility differs from the test articulated in the various exchanges' rules for determining whether a director is an 'independent director' for purposes of satisfying exchange rules, including NASDAQ Rule 5605(a)(2)." (citing *Sandys*, 152 A.3d at 132–32; *Teamsters Union 25 Health Servs. & Ins. Plan v. Baiera*, 119 A.3d 44, 61–62 (Del Ch. 2015) ("Unlike the [New York Stock Exchange] Rules, Delaware law does not contain bright-line tests for determining independence but instead engages in a case-by-case fact specific inquiry based on well-pled factual allegations."))).)

situations," which the *Sandys* court addressed. 152 A.3d at 134; *cf. Harbor Fin. Partners v. Huizenga*, 751 A.2d 879, 883–84 (Del. Ch. 1999) (finding a lack of independence where "the [company] directors' business relationships with one another are not confined to their common association with [the company] [but rather] the [company] directors have worked together as fellow directors, managerial colleagues, and shareholders in a variety of business enterprises over the years").

Contrary to Defendants' assertion that a ruling in Plaintiff's favor would establish the "untenable proposition that any time two or more directors are associated with venture capital firms, they are automatically deemed not independent of each other," (Defs.' Reply 9),[14] I find only that the Complaint identifies sufficiently close business ties between this particular group of individuals—including a significant number of overlapping investments and leadership roles in more than 20 different companies—to support an "admittedly imprecise, pleading stage determination" that Defendants Ross, Bolte, and Dyrberg may not have been able to impartially evaluate a litigation demand implicating Guyer. *Sandys*, 152 A.3d at 128 (internal quotation marks omitted). Because I conclude that there is a reasonable doubt as to the ability of Defendants Ross, Bolte, and Dyrberg to act independently of Defendant Guyer, I find that Plaintiff has adequately alleged that a majority of Ophthotech's directors were either interested or not independent, and that serving a litigation demand on the Board would therefore have been futile. As a result, I need not address Plaintiff's allegations that the remaining directors— Sblendorio and Redlick—are also beholden to Defendant Guyer.[15]

---

[14] "Defs.' Reply" refers to the Reply Memorandum of Law in Support of Defendants' Motion to Dismiss the Verified Stockholder Derivative Complaint, filed April 3, 2019. (Doc. 41.)

[15] Plaintiff alleges that Redlick lacks independence because he is a retired WilmerHale partner who previously served as counsel to Guyer, Ross, Galakatos, and Bolte, and their respective venture capital firms. (Compl. ¶ 120.) Sblendorio also allegedly lacks independence because he—like Guyer—is an Ophthotech employee, (*id.* ¶ 122), who the Ophthotech Board determined did not qualify as independent under the NASDAQ rules, (*see* Defs.' Br. 23

**V.      Conclusion**

For the foregoing reasons, Defendants' motion to dismiss the Complaint is DENIED.

The Clerk of Court is respectfully directed to terminate the motion pending at Docket

Entry 32.

SO ORDERED.

Dated:  September 19, 2019
         New York, New York

Vernon S. Broderick
United States District Judge

---

n.15).  Because I have concluded that the Complaint satisfactorily alleges that a majority of the Ophthotech directors (Guyer, Ross, Bolte, and Dyrberg) are either interested or not independent, I decline to make a determination as to the independence under Delaware law of Defendants Sblendorio or Redlick.